# EXHIBITS

 LexisNexis®

2 of 3 DOCUMENTS

LEXIS DISTRICT OF COLUMBIA CODE ANNOTATED
Copyright 2013 by Matthew Bender & Company, Inc.,
a member of the LexisNexis Group.
All rights reserved.

*** ARCHIVE MATERIAL ***

*** CURRENT THROUGH D.C. LAW 18-78, EFFECTIVE OCTOBER 22, 2009 ***
*** AND THROUGH D.C. ACT 18-229, WITH THE EXCEPTION OF ACT 18-207 ***
*** STATE ANNOTATIONS CURRENT THROUGH JUNE 11, 2009 ***

TITLE 22.   CRIMINAL OFFENSES AND PENALTIES
SUBTITLE I.   CRIMINAL OFFENSES
CHAPTER 13.   DISTURBANCES OF THE PUBLIC PEACE

D.C. Code § **22-1321**   (2009)

§ **22-1321.** Disorderly conduct [Formerly § 22-1121]


Whoever, with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby: (1) acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others; (2) congregates with others on a public street and refuses to move on when ordered by the police; (3) shouts or makes a noise either outside or inside a building during the nighttime to the annoyance or disturbance of any considerable number of persons; (4) interferes with any person in any place by jostling against such person or unnecessarily crowding such person or by placing a hand in the proximity of such person's pocketbook, or handbag; or (5) causes a disturbance in any streetcar, railroad car, omnibus, or other public conveyance, by running through it, climbing through windows or upon the seats, or otherwise annoying passengers or employees, shall be fined not more than $ 250 or imprisoned not more than 90 days, or both.

**HISTORY:** June 29, 1953, 67 Stat. 98, ch. 159, § 211a; 1973 Ed., § 22-1121; 1981 Ed., § 22-1121; May 21, 1994, D.C. Law 10-119, § 9(a), 41 DCR 1639.

**NOTES:** SECTION REFERENCES. --This section is referenced in § 16-801 and § 22-1809.

LEGISLATIVE HISTORY OF LAW 10-119. --See note to § 22-1319.


ANALYSIS
  Constitutionality
  Due process
  Elements
  Evidence
-- Insufficient
-- Sufficient
  Overbroad clause
  Probable cause

§ 22-3302. Unlawful entry on property

(a) (1) Any person who, without lawful authority, shall enter, or attempt to enter, any private dwelling, building, or other property, or part of such dwelling, building, or other property, against the will of the lawful occupant or of the person lawfully in charge thereof, or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant, or of the person lawfully in charge thereof, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not more than the amount set forth in § 22-3571.01, imprisonment for not more than 180 days, or both. The presence of a person in any private dwelling, building, or other property that is otherwise vacant and boarded-up or otherwise secured in a manner that conveys that it is vacant and not to be entered, or displays a no trespassing sign, shall be prima facie evidence that any person found in such property has entered against the will of the person in legal possession of the property.

(2) For the purposes of this subsection, the term "private dwelling" includes a privately owned house, apartment, condominium, or any building used as living quarters, or cooperative or public housing, as defined in section 3(1) of the United States Housing Act of 1937, approved August 22, 1974 (88 Stat. 654; 42 U.S.C. § 1437a(b)), the development or administration of which is assisted by the Department of Housing and Urban Development, or housing that is owned, operated, or financially assisted by the District of Columbia Housing Authority.

(b) Any person who, without lawful authority, shall enter, or attempt to enter, any public building, or other property, or part of such building, or other property, against the will of the lawful occupant or of the person lawfully in charge thereof or his or her agent, or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant, or of the person lawfully in charge thereof or his or her agent, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not more than the amount set forth in § 22-3571.01, imprisonment for not more than 6 months, or both.

HISTORY: Mar. 3, 1901, 31 Stat. 1324, ch. 854, § 824; Mar. 4, 1935, 49 Stat. 37, ch. 23; July 17, 1952, 66 Stat. 766, ch. 941, § 1; Apr. 24, 2007, D.C. Law 16-306, § 219, 53 DCR 8610; Dec. 10, 2009, D.C. Law 18-88, § 215, 56 DCR 7413; June 11, 2013, D.C. Law 19-317, § 201(h), 60 DCR 2064.

NOTES: CROSS REFERENCES. --Burglary, see § 22-801.
  Public lands, trespass, damage to, and removal of property, federal crimes and offenses, see 18 U.S.C. § 1851 et seq.

SECTION REFERENCES. --This section is referenced in § 23-581.

PRIOR CODIFICATIONS. --1981 Ed., § 22-3102.
  1973 Ed., § 22-3102.

EFFECT OF AMENDMENTS. --D.C. Law 16-306 inserted: "The presence of a person in any private dwelling, building, or other property that is otherwise vacant and boarded-up or otherwise secured in a manner that conveys that it is vacant and not to be entered, or displays a no trespassing sign, shall be prima facie evidence that any person found in such property has entered against the will of the person in legal possession of the property."
  D.C. Law 18-88 rewrote the section, which had read as follows: "Any person who, without lawful authority, shall enter, or attempt to enter, any public or private dwelling, building, or other property, or part of such dwelling, building, or other property, against the will of the lawful occupant or of the person lawfully in charge thereof, or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant, or of the person lawfully in charge thereof, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not

exceeding $100 or imprisonment in the Jail for not more than 6 months, or both, in the discretion of the court. The presence of a person in any private dwelling, building, or other property that is otherwise vacant and boarded-up or otherwise secured in a manner that conveys that it is vacant and not to be entered, or displays a no trespassing sign, shall be prima facie evidence that any person found in such property has entered against the will of the person in legal possession of the property."

The 2013 amendment by D.C. Law 19-317 substituted "not more than the amount set forth in § 22-3571.01" for "not more than $1,000" in (a)(1) and (b).

EMERGENCY LEGISLATION. --For temporary (90 day) amendment of section, see § 7(a) of the Sentencing Reform Congressional Review Emergency Amendment Act of 2001 (D.C. Act 13-462, October 25, 2000, 47 DCR 9443).

For temporary (90 day) amendment of section, see § 219 of Omnibus Public Safety Emergency Amendment Act of 2006 (D.C. Act 16-445, July 19, 2006, 53 DCR 6443).

For temporary (90 day) amendment of section, see § 219 of Omnibus Public Safety Congressional Review Emergency Amendment Act of 2006 (D.C. Act 16-490, October 18, 2006, 53 DCR 8686).

For temporary (90 day) amendment of section, see § 219 of Omnibus Public Safety Congressional Review Emergency Amendment Act of 2007 (D.C. Act 17-10, January 16, 2007, 54 DCR 1479).

For temporary (90 day) amendment of section, see § 219 of Omnibus Public Safety Second Congressional Review Emergency Amendment Act of 2007 (D.C. Act 17-25, April 19, 2007, 54 DCR 4036).

For temporary (90 day) amendment of section, see § 215 of Omnibus Public Safety and Justice Emergency Amendment Act of 2009 (D.C. Act 18-181, August 6, 2009, 56 DCR 6903).

For temporary (90 day) amendment of section, see § 215 of Omnibus Public Safety and Justice Congressional Review Emergency Amendment Act of 2009 (D.C. Act 18-227, October 21, 2009, 56 DCR 8668).

LEGISLATIVE HISTORY OF LAW 16-306. --Law 16-306, the "Omnibus Public Safety Amendment Act of 2006", was introduced in Council and assigned Bill No. 16-247, which was referred to Committee on the Judiciary. The Bill was adopted on first and second readings on June 6, 2006, and October 3, 2006, respectively. Signed by the Mayor on October 17, 2006, it was assigned Act No. 16-482 and transmitted to both Houses of Congress for its review. D.C. Law 16-306 became effective on April 24, 2007.

LEGISLATIVE HISTORY OF LAW 18-88. --For Law 18-88, see notes following § 22-402.

LEGISLATIVE HISTORY OF LAW 19-317. --See note to § 22-3301.

EDITOR'S NOTES. --Applicability of D.C. Law 19-317: Section 401 of D.C. Law 19-317 provided that the act shall apply only to offenses committed on or after June 11, 2013.

D.C. Code § 22-3302

**METROPOLITAN POLICE DEPARTMENT**
Washington, D. C.

ARREST/PROSECUTION REPORT

P.D. 163 Rev3/2008                    G.O. 401.5

| | |
|---|---|
| **1. PERSON NOTIFIED OF NAME CHANGE – UNIT – DATE/TIME – NCIC NO. (ID ONLY)** | **2. ID NUMBER (ID ONLY)** ▶ |

**5. UNIT-ARREST NO.**
511000801

**3. DEFENDANT'S TRUE NAME – LAST, FIRST, MIDDLE (ID ONLY)**

**4. CID NUMBER**

**8. Arresting Officer's Name**
VINH, ANDY B.

**9.TYPE OF RELEASE**
☐ CITATION ☐ BOND
☐ COLLATERAL

| Rank | Badge # | Agency |
|---|---|---|
| OFC | 522 | MTPD |

**12. COURT DATE**

**6. DEFENDANT'S NAME – LAST, FIRST, MIDDLE (At time of arrest)**
RONKIN, KARISSA A.

**10. NICKNAME / ALIAS** ▶

**13. ADDRESS** (Include Room / Apt. No. City & State if Outside D.C.)
▶ 1036 NEWTON ST., NE WASHINGTON DC

**7. DEA LAB NUMBER**

**11. PHONE NUMBER**
609-922-2865

**14. TIME IN D.C.**

**15.** ☐ CHILD ABUSE   ☐ GANG   ☐ HATE   ☐ SENIOR CITIZEN   ☐ DOMESTIC VIOLENCE
SPECIAL INTELLIGENCE

| 16. SEX ▶ Female | 17. RACE ▶ White | 18. BIRTHDATE ▶ | 19. SOCIAL SECURITY NUMBER |
|---|---|---|---|

**20. NEED INTERPRETER** ☐ YES ☒ NO

| 21. HEIGHT | 22. WEIGHT | 23. HAIR | 24. EYES | 25. COMPLEX | 26. PERMIT NO/ST | 27. BIRTHPLACE (City & State) |
|---|---|---|---|---|---|---|
| 5'08 | 165 | BRN | BRN | Light | R641242561 60882 | VORHEES, NJ |

**28. CO-DEFENDANTS:** Number 0 (If more than 3, list on back)
NAME, ADDRESS, ZIP CODE AND PHONE NUMBER

1.

2.         ,

3.         ,

**29. IMPERSONATOR?** ☐ M ☐ F ☒ NO

**30. ETHNICITY**

**31. CAUTION**

**32. SCARS/MARKS/TATTOOS**
N/A

| 33. HAT N/A | 34. JACKET N/A | 35. PANTS N/A |
|---|---|---|
| 36. COAT N/A | 37. SHIRT N/A | 38. SKIRT/DRESS FLORAL DRESS |

**CHECK MADE BY** (Name)
OFC SNEAD, E.

**39. WALES/NCIC CHECK**

**NCIC NUMBER**
242061450

**WARRANT ON FILE** (If Yes, enter Warrant Numbers)
Yes ☐   No ☒

**40. LOCATION OF OFFENSE** (Exact Address, include Room / Apt No.)
▶ 630 H ST., NW WASINGTON DC 20003

**40. LOCATION OF ARREST** (Exact Address, include Room / Apt No.)
▶ 630 H ST., NW WASINGTON DC 20003

| DATE OF OFFENSE ▶ 09/16/10 | TIME OF OFFENSE ▶ 2245 HRS |
|---|---|
| DATE OF ARREST ▶ 09/16/10 | TIME OF ARREST ▶ 2250 HRS |

**42. ASSISTING OFFICER'S NAME, RANK, BADGE NO. & UNIT OR AGENCY**
▶

**ASSISTING OFFICER'S NAME, RANK, BADGE NO. & UNIT OR AGENCY**
▶

| DATE | TIME | LOCATION |
|---|---|---|

**43. DEFENDANT ADVISED OF RIGHTS**
OFFICER'S NAME – ADVISING / COMPLETING PD FORM 47/47A

| BADGE NO. | UNIT |
|---|---|

**44. COMPLAINANTS / WITNESSES** (If sworn member – Name, Rank, Badge No. and Unit)   MORE ☐   See Back

NAME – LAST, FIRST, M.I.        ADDRESS – STREET, CITY, STATE, ZIP CODE

W-1 ▶ WMATA            600 5TH ST. NW, WASHINGTON DC

W-2 ▶ CIACCIO, MICHAEL    6207 ARKENDALE RD. ALEXANDRIA VA

| BIRTHDATE | HOME PHONE NO. | WORK PHONE NO. |
|---|---|---|
| | | 202-962-2121 |
| | 832-277-0725 | |

| 45. SPEC. OPS NONE | 46. TACTICS | 47. PREMISES | 48. SCHOOL ZONE ☐   PUBLIC HOUSING ☐ |
|---|---|---|---|

| | CHARGES | NOI OR WARRANT NUMBER | CCN | MPD DISPOS. | COLLA./BOND RECEIPT NO |
|---|---|---|---|---|---|
| ENTER THE LEAD CHARGE FIRST | 1. DISORDERLY CONDUCT/PUBLIC INTOXICATION | | | | |
| | 2. UNLAWFUL ENTRY | | | | |
| | 3. | | | | |
| | 4. | | | | |
| | 5. | | | | |

**50. PROPERTY RECOVERY / ITEMS OF EVIDENCE**

| PROPERTY BOOK/ PAGE NO. | CSES NO. | 51. INITALS – DATE – UNIT OF PERSON TAKING PRINT | 53. RIGHT THUMB PRINT |
|---|---|---|---|

**52. M. O. WEAPONS, HANGOUTS, HABITS, INSTRUMENTS**

| ⌐. CCB USE ONLY | HEIGHT | WEIGHT | HAIR | EYES | COMPLEX | SCARS/MARKS/TATTOOS |
|---|---|---|---|---|---|---|

DISTRIBUTION: Page 1 to ID & R ; Page 2 & 3 to Prosecutor; Page 4, Unit Copy; Page 5 Officer's Copy

COMPLETE ALL REQUIRED FIELDS AND MAKE FIVE COPIES FRONT TO BACK

**55. EMPLOYMENT HISTORY** *(List present employment if any, on Line 1)*

| | FROM –DATE –TO | EMPLOYER | ADDRESS | BUS. PHONE | OCCUPATION |
|---|---|---|---|---|---|
| 1. | Present | UNEMPLOYED | | | |
| 2. | | | | | |

**56. NAMES OF LIVING FAMILY, RELATIVES, FRIENDS AND ASSOCIATES** *(Begin with immediate family)*

| RELATIONSHIP | DOB/AGE | NAME – LAST, FIRST, M.I. | ADDRESS – STREET, CITY, STATE, ZIP CODE | PHONE NUMBER |
|---|---|---|---|---|
| MOTHER | 10/25 | KARLA RONKIN | 230 SUNNY JIM DR., MEDFORD, NJ 09055 | 609-953-3782 |
| FATHER | | CHUCK RONKIN | 230 SUNNY JIM DR., MEDFORD, NJ 09055 | 609-953-3782 |
| SISTER | 3/3 | HAYLEY RONKIN | 230 SUNNY JIM DR., MEDFORD, NJ 09055 | 609-953-3782 |

| 57. MILITARY SERVICE: BRANCH/DATE FROM – TO<br>N/A | 58. TELEPHONE CALL MADE<br>☐ YES  ☒ NO  ☐ REFUSED | 59. PHONE NUMBER<br>N/A |
|---|---|---|

**60. STATEMENT OF FACTS:** *(Give a brief statement in your own words, of the facts surrounding the offense and the arrest. (Use Continuation Form PD 202A for additional space. Note present condition of any injured person(s). Do not give Witnesses' Names or Addresses. Refer to them as W1 or W2, etc as indicated in Item 31.)*

The event occurred on 09/16/10 at approximately 2245 HRS at 630 H ST., NW WASINGTON DC 20003 in Washington DC.

THE UNDERSIGNED OFFICER OBSERVED THE DEFENDANT, IDENTIFIED AS KARISSA A. RONKIN, ENTER THE GALLERY PLACE / CHINATOWN METRO STATION AT THE 7TH ST. AND H ST. ENTRANCE. THE DEFENDANT BEGAN TO HORSE PLAY AND ROUGH HOUSE WITH HER BOYFRIEND BY THE FARE MACHINE CAUSING PATRONS TO FLEE AND OTHERS TO GATHER. THIS OFFICER APPROACHED THE DEFENDANT AND INSTRUCTED HER TO DISCONTINUE THE HORSE PLAY. THE DEFENDANT AND HER BOYFRIEND IGNORED THE INSTRUCTIONS AND CONTINUED TO ROUGH HOUSE. AT THIS TIME, THIS OFFICER NOTICE A STRONG ODOR OF AN ALCOHOLIC BEVERAGE COMING FROM HER PERSON. THIS OFFICER INFORMED THE DEFENDANT AND HER PARTY, THEY MUST LEAVE THE PREMISES AND NOT TO RETURN. THE DEFENDANT EXCLAIMED, "I'M 21 FUCKING YEARS OLD AND I CAN DO WHAT EVER THE FUCK I WANT!" THE DEFENDANT AND HER PARTY LEFT THE AREA. APROXIMATELY FIVE MINTUES LATER, THE DEFENDANT RETURNED AND WAS DETERMINED TO ENTER THE METRO SYSTEM. THIS OFFICER INFORMED THE DEFENDANT THAT IF SHE REFUSE TO LEAVE THE AREA, THEN SHE WOULD BE TAKEN INTO CUSTODY FOR UNLAWFUL ENTRY. THE DEFENDANT EXCLAIMED, "YOU ARE A FUCKING ASSHOLE, I'M 21 YEARS OLD!!" AT THIS TIME, THE DEFENDANT WAS TAKEN INTO CUSTODY. THE DEFENDANT WAS THEN TRANSPORTED TO METROPOLITAN DISTRICT I FOR FURTHER PROCESSING. ALL EVENTS OCCURRED IN WASHINGTON DC.

**61. DEFENDANT'S VERSION / REMARKS:** *[What did defendant say about the offense or his/her whereabouts at the time of offense? (Use PD 118 for defendant's written statement.)]*

| 62. RECORD CLERK'S NAME<br>OFC SNEAD, E. | 3. | 5. | 64. PROPERTY BOOK/PAGE NO.<br>PRISONER'S PROPERTY ONLY |
|---|---|---|---|
| ARREST RECORD SUMMARY | | | |
| 1. | 2. | 4. | 6. | |

| 65. BAIL REFORM ACT CASES: | Was a statement made by defendant in reference to his/her failure to appear?  ☐ Yes  ☐ no<br>(If yes, include in Defendant's Version/Remarks Section above.) |
|---|---|

| 66. PRINTED NAME – OFFICER MAKING STATEMENT<br>VINH, ANDY B.<br>67. SIGNATURE OF OFFICER MAKING STATEMENT | BADGE NUMBER<br>522 | RANK<br>OFC | 68. SIGNATURE OF REVIEWING OFFICIAL |
|---|---|---|---|
| | UNIT<br>MTPD | DATE<br>9/17/2010 | UNIT ID | DATE<br>9.17 10 |

## 75. Compliance with Laws, Regulations and Ordinances

The Board shall comply with all laws, ordinances and regulations of the Signatories and political subdivisions and agencies thereof with respect to use of streets, highways and all other vehicular facilities, traffic control and regulation, zoning, signs and buildings.

## 76. Police[22(76a & c); 23(76b & e)]

(a) The Authority is authorized to establish and maintain a regular police force, to be known as the Metro Transit Police, to provide protection for its patrons, personnel, and transit facilities. The Metro Transit Police shall have the powers and duties and shall be subject to the limitations set forth in this section. It shall be composed of both uniformed and plainclothes personnel and shall be charged with the duty of enforcing the laws of the Signatories, and the laws, ordinances and regulations of the political subdivisions thereof in the Transit Zone, and the rules and regulations of the Authority. The jurisdiction of the Metro Transit Police shall be limited to all the transit facilities (including bus stops) owned, controlled or operated by the Authority, but this restriction shall not limit the power of the Metro Transit Police to make arrests in the Transit Zone for violations committed upon, to or against such transit facilities committed from within or outside such transit facilities, while in hot or close pursuit or to execute traffic citations and criminal process in accordance with subsection (c) below. The members of the Metro Transit Police shall have concurrent jurisdiction in the performance of their duties with the duly constituted law enforcement agencies of the Signatories and of the political sub-divisions thereof in which any transit facility of the Authority is located or in which the Authority operates any transit service. Nothing contained in this section shall either relieve any Signatory or political subdivision or agency thereof from its duty to provide police, fire and other public safety service and protection, or limit, restrict or interfere with the jurisdiction of or the performance of duties by the existing police, fire and other public safety agencies. For purposes of this section, "bus stop" means that area within 150 feet of a metrobus bus stop sign, excluding the interior of any building not owned, controlled or operated by the Washington Metropolitan Area Transit Authority.

(b) A member of the Metro Transit Police shall have the same powers, including the power of arrest, and shall be subject to the same limitations, including regulatory limitations, in the performance of his duties as a member of the duly constituted police force of the political subdivision in which the Metro Transit Police member is engaged in the performance of his duties. A member of the Metro Transit Police is authorized to carry and use only such weapons, including handguns, as are issued by the Authority. A member of the Metro Transit Police is subject to such additional limitations in the use of weapons as are imposed on the duly constituted police force for the political subdivision in which he is engaged in the performance of his duties.

(c) Members of the Metro Transit Police shall have power to execute on the transit facilities owned, controlled or operated by the Authority any traffic citation or any criminal process issued by any court of any Signatory or of any political subdivision of a Signatory, for any felony, misdemeanor or other offense against the laws, ordinances, rules or regulations specified in subsection (a). However, with respect to offenses committed upon, to, or against the transit facilities owned, controlled or operated by the

Authority, the Metro Transit Police shall have power to execute criminal process within the Transit Zone.

(d) Upon the apprehension or arrest of any person by a member of the Metro Transit Police pursuant to the provisions of subsection (b), the officer, as required by law of the place of apprehension or arrest, shall either issue a summons or a citation against the person, book the person, or deliver the person to the duly constituted police or judicial officer of the Signatory or political subdivision where the apprehension or arrest is made, for disposition as required by law.

(e) The Authority shall have the power to adopt rules and regulations for the safe, convenient and orderly use of the transit facilities owned, controlled or operated by the Authority, including the payment and the manner of the payment of fares or charges therefor, the protection of the transit facilities, the control of traffic and parking upon the transit facilities, and the safety and protection of the riding public. In the event that any such rules and regulations contravene the laws, ordinances, rules or regulations of a Signatory or any political subdivision thereof which are existing or subsequently enacted, these laws, ordinances, rules or regulations of the Signatory or the political subdivision shall apply and the conflicting rule or regulation, or portion thereof, of the Authority shall be void within the jurisdiction of that Signatory or political subdivision. In all other respects, the rules and regulations of the Authority shall be uniform throughout the Transit Zone. The rules or regulations established under this subsection shall be adopted by the Board following public hearings held in accordance with section 62(c) and (d) of this Compact. The final regulation shall be published in a newspaper of general circulation within the Zone at least 15 days before its effective date. Any person violating any rule or regulation of the Authority shall be subject to arrest and, upon conviction by a court of competent jurisdiction, shall pay a fine of not more than $250 and costs. Criminal violations of any rule or regulation of the Authority shall be prosecuted by the Signatory or political subdivision in which the violation occurred, in the same manner by which violations of law, ordinances, rules and regulations of the Signatory or political subdivision are prosecuted.

(f) With respect to members of the Metro Transit Police, the Authority shall
   (1) establish classifications based on the nature and scope of duties, and fix and provide for their qualifications, appointment, removal, tenure, term, compensation, pension and retirement benefits;
   (2) provide for their training and for this purpose, the Authority may enter into contracts or agreements with any public or private organization engaged in police training, and this training and the qualifications of the uniformed and plainclothes personnel shall at least equal the requirements of each Signatory and of the political subdivisions therein in the Transit Zone for their personnel performing comparable duties; and
   (3) prescribe distinctive uniforms to be worn.

(g) The Authority shall have the power to enter into agreements with the Signatories, the political subdivisions thereof in the Transit Zone, and public safety agencies located therein, including those of the federal government, for the delineation of the functions and responsibilities of the Metro Transit Police and the duly constituted police, fire and other public safety agencies, and for mutual assistance.

(h) Before entering upon the duties of office, each member of the Metro Transit Police shall take or subscribe to an oath or affirmation, before a person authorized to administer oaths, faithfully to perform the duties of that office.

# Tariff of
# The Washington Metropolitan Area Transit Authority
# On
# Metro Operations
# Within the
# Washington Metropolitan Area
### Tariff Number 29
### Effective August 29, 2010
### Draft - Version under review

## Contents

Application of the Tariff ..................................................................................................3
Metrorail Fare Structure ...............................................................................................4
Metrorail Parking.........................................................................................................5
Metrobus Fare Structure ..............................................................................................8
    Fares ........................................................................................................................8

    Bus Transfers..........................................................................................................9

    Rail Transfers SmarTrip® .....................................................................................10

    Other Fare Media Accepted ...................................................................................10

    Transfer Period for Linked Trips............................................................................10

    Special Fares..........................................................................................................10

    Tokens ...................................................................................................................11

Transit Pass Program...................................................................................................11
    Metrobus Only Flash Passes: ................................................................................11

    Metrorail/Metrobus Passes: ..................................................................................12

    Metrorail Passes:...................................................................................................12

    Other Special Fare Media: .....................................................................................13

    Other Products:......................................................................................................14

Promotional & Demonstration Fares ...........................................................................14
    Current Promotional & Demonstration Fare Programs:...........................................14

Paratransit Fare Structure ...........................................................................................15
    Paratransit (MetroAccess).......................................................................................15

General Rules and Regulations .....................................................................................18

1.  Power of Agents................................................................................................18
2.  Schedule Changes.............................................................................................18
3.  Objectionable Persons ....................................................................................18
4.  Passenger Prohibitions....................................................................................18
5.  Carriage of Small Animals .............................................................................19
6.  Accidents and Delays ......................................................................................20
7.  Free Transportation.........................................................................................20
8.  Fare Evasion .....................................................................................................21
9.  District of Columbia School Student Regulations.......................................21
10.  Senior Citizens and People with Disabilities...............................................23
11.  Metrobus Tokens..............................................................................................27
12.  Issuance and Use of WMATA Transfers (effective January 4, 2009) .........27
13.  Acceptance of Bus Transfers From Other Systems .....................................28
14.  Regular/Reduced Fare Period Regulations...................................................28
15.  Baggage .............................................................................................................29
16.  Bicycles (94-37).................................................................................................29
17.  Automatic Balancing Wheeled Conveyance (ABWC) (2005-34) .................30
18.  Lost Articles......................................................................................................32
19.  Refunds and Exchanges of Fare Media.........................................................32
20.  Lost Farecards..................................................................................................35
21.  Lost SmarTrip® Cards.....................................................................................35
22.  Temporary Reduction of Fares.......................................................................35

2

## Application of the Tariff

The fares stated herein are applicable to the transportation of passengers on the Metrobus, Metrorail, and MetroAccess systems of the Washington Metropolitan Area Transit Authority from one point to another within the Washington Metropolitan Area Transit Zone which embraces the District of Columbia, the cities of Alexandria, Falls Church, Fairfax, Manassas, and Manassas Park and the counties of Arlington, Fairfax, Loudoun, and part of Prince William, and the political subdivisions of the Commonwealth of Virginia located within those counties, and the counties of Montgomery, Prince George's, and parts of Charles and Anne Arundel and political subdivisions of the State of Maryland located in said counties.

3

# General Rules and Regulations

### 1. Power of Agents

Except as provided by rule 22 of the General Rules and Regulations, no agent or other employee shall have the authority to change or deviate from the fare, charges, or rules and regulations contained herein.

### 2. Schedule Changes

The Authority reserves the right to change schedules of service without notice to the public, except as set forth in the Rules and Regulations of the Authority.

### 3. Objectionable Persons

The Authority reserves the right to refuse to transport a person or persons under the influence of intoxicating liquor or drugs, or whose conduct is such, or likely to be such, as to make that person objectionable to other persons.

### 4. Passenger Prohibitions

**Passengers shall not:**

a. Expectorate (spit) in or upon any part of any Metro station, railcar, bus, or vehicle;

b. Smoke or carry a lighted or smoldering pipe, cigar, or cigarette within the paid area of any Metro station, railcar, bus, or vehicle;

c. Stand in front of the yellow line marked on the forward end of the floor of any bus, or otherwise conduct themselves in such a manner as to obstruct the vision of the operator;

d. Board any bus through the rear exit door, unless directed to do so by an employee or agent of the Authority;

e. Carry any flammable or combustible liquids, explosives, acids, live animals, birds, or reptiles, or any item inherently dangerous within a Metro station or upon any bus or railcar, or vehicle, except for (i) trained service animals accompanied by a passenger with a disability, and (ii) small animals properly packaged and hand-carried;

18

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

-------------------------------:
KARISSA A. RONKIN,                    :
                                      :
            Plaintiff,      : Case No:
                            : 1:12-CV-00729 (RBW)
      vs.                   :
                            :
ANDY VINH,                  :
                            :
            Defendant.      :
-------------------------------:

                          Washington, D.C.

                  Wednesday, July 10, 2013

Video Deposition of:

                      ANDY VINH

called for oral examination by counsel for Defendant,

pursuant to notice, at 600 5th Street, Northwest,

Washington, D.C., before Katherine Gyumolcs, RPR, of

Capital Reporting Company, a Notary Public in and for

the District of Columbia, beginning at 12:59 p.m.,

when were present on behalf of the respective parties:

Capital Reporting Company
Vinh, Andy  07-10-2013

26

A   Yes.
Q   Fair enough. Are you assigned to that location with other officers?
A   It depends on the manning shift. If there's available personnel, yes, there's going to be another two or three officers. On other days the schedule will have officers within the vicinity either at Metro Center or Judiciary Square. So they are within close proximity to each other to back each other up.
Q   Okay. And what types of things would impact whether there is going to be more than one officer assigned to a given stop or not?
A   That's up to the shift commander on how he sets his schedule.
Q   And do you know any of the factors that he considers in setting up the schedule?
A   That's a variable that changes all the time, so I don't know.
Q   He has never discussed with you any of the considerations that are given to how he staffs various locations?
A   No, he does not.

27

Q   Have you ever noticed a pattern in how they are staffed, meaning, for instance, on busier days with larger crowds there's more officers or not?
A   Well, there will be an influx of more officers during the evening rush just to provide more security, a more visible uniform officer in the area. But once -- approximately at 6:30, 7:00, once the evening rush dies, then the other officers who -- extra officers will then respectively go back to their original beat.
Q   And at the time that the Ronkin incident occurred, is it safe to say the evening rush was over?
A   Yes.
Q   And is it also safe to say you were the only officer in that location at that time?
A   Yes.
Q   Explain to me -- or tell us when it was the first time that you saw Ms. Ronkin that you recall.
A   I recall just standing at the 7 and H kiosk. I had a conversation with the station manager, Mr. Dowtin. I don't recall what the conversation was all about. We -- both he and I observed three

28

individuals coming down the escalators, loud, boisterous. It was unusual because it was a Thursday night. Usually we find a lot of patrons at that time come through on a Friday or Saturday night because it's the weekends and Gallery Place do (sic) have restaurants and bars that a lot of people visit and enjoy themselves.
So when these three individuals came down to the fare machine side, I did notice that Ms. Ronkin and her male friend were horse-playing in that area. The horse-playing became a little bit more serious when she did a roundhouse kick to her friend's hand which knocked a lot of his personal items -- his wallet, his cards, keys I believe, onto the floor and -- which caused some people to skip or jump away because of the flying debris.
I made a decision at that point to approach Ms. Ronkin and her party and inform them that if they were going to be horse-playing like that, they needed to take it outside.
Q   You did not arrest her at that time?
A   No, I did not.

29

Q   Did you see any reason to arrest her at that time?
A   There was no reason for me to arrest her.
Q   She hadn't committed any crime at that time.
A   Aside from, again, the horse-play that she committed -- I just told them, if they are going to do that, take it outside.
Q   The horse-play that you observed, did it qualify as a criminal offense as you --
A   No, it did not.
Q   We're stepping on each other, but -- just, again, the horse-play that you observed, it didn't qualify or fit under the definition of any crimes that you're aware of?
A   Yes, it did not qualify.
Q   Fair enough. And so you asked her to leave?
A   Yes.
Q   And did she?
A   She resisted by saying that she wanted to use the Metro system to go home, and she was entitled to utilize the system because it was her birthday. And at that time I told her, well, then go ahead and

Capital Reporting Company
Ronkin, Karissa A. 04-18-2013

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------:
KARISSA A. RONKIN,              :
                               :
            Plaintiff,          :
      vs.                       : Case No.
                               : 1:12-CV-00729
ANDY B. VINH,                   :
                               :
            Defendant.          :
-------------------------------:

                              Washington, D.C.
                    Thursday, April 18, 2013

Videotaped Deposition of:

            KARISSA A. RONKIN

called for oral examination by counsel for

Defendant, pursuant to notice, at the office of

Washington Metropolitan Area Transit Authority, 600

5th Street, Northwest, Washington, D.C., before Amber

L. Dill, of Capital Reporting Company, a Notary Public

in and for the District of Columbia, beginning at

11:19 a.m., when were present on behalf of the

respective parties:

Capital Reporting Company
Ronkin, Karissa A. 04-18-2013

26

A   -- I don't recall lots of wild movement.

Q   Okay.  What did the officer say?

A   I remember, "If you're going to fuck around, then get the fuck off my Metro."  I'm sorry for saying that word.  I'm sorry.

Q   And --

MR. JACOB:  Just so we're clear, he didn't apologize.  You're apologizing.

THE WITNESS:  Oh, yeah, I was apologizing for -- for using that word.

BY MS. CAREY:

Q   I'm a big girl.

A   Okay.

Q   So he used that language to you?

A   Yes.

Q   And then what did you -- did you make any -- did you have any response to the officer?

A   I did.

Q   What did you say?

A   I remember being aghast, and then I remember saying that's not appropriate and -- and --

Q   You're --

27

A   -- responding.

Q   I want your exact words.

A   I don't remember my exact words.

Q   Okay.

A   Honestly, I remember my reaction.

Q   And -- and can you describe your reaction for me?

A   My reaction is being really offended and taken aback and then defensive.

Q   Okay.  So were you offended that he told you, "If you're going to fuck around, get the fuck off my Metro," or was it the language that he's using?

A   Both.  I thought there was a lot of audacity there but also just really the language.  I thought it was really disrespectful.

Q   Did -- he was in uniform, correct?

A   Yes.

Q   So there wasn't any question in your mind about that he was a police officer?

A   No.

Q   Is that right?

A   That's what blew my mind.

28

Q   And so what -- tell me what you did at that point.

A   I remember getting in an argument with him about the appropriateness of that and then him claiming it's his Metro and me wanting to get on the Metro so I could go home.

Q   How long did that argument last?

A   I don't remember it lasing very long.

Q   And do you remember anything of what you said to the officer in that initial confrontation?

A   I don't remember exact words.  I remember getting upset, and I remember just being really taken aback and just, like, stunned that this was happening, so reacting to that.

Q   Well, in reacting to that, did you use the same kind of language back to the officer?

A   Yes.

Q   Okay.  So what did you say?

A   I -- I'm sure I used the F-word and --

Q   Meaning what?  You have -- you know, we're on the record.  You've got to tell me exactly what it is that you said.

29

A   You want me to say fuck?

Q   Yeah.

A   Okay.

Q   If that's what you said, I want you to tell me exactly what you said.

A   Okay.

MR. JACOB:  With a caveat, don't guess.  Just say -- I mean, I know you said you know you said the F-word.  But other than that, I mean, don't guess.

BY MS. CAREY:

Q   Okay.  I'm not asking --

A   Yeah.

Q   -- you to guess.  I'm asking what you said, what language you used.

A   I know I used the word "fuck."  I just -- yeah, I really can't remember exact words, but I'm sure I was, like, I'm not doing anything wrong or not doing anything fucking wrong.  That's a guess.

But I'm not doing anything wrong and I want to get on the Metro and, please, don't use that tone of voice with me and -- but it was -- I was angry, and I used the word "fuck" I'm -- I'm sure.

# Capital Reporting Company
## Ronkin, Karissa A. 04-18-2013

30

Q   And then did you leave?

A   Yes. I think I was, like, we're not getting anywhere, and so we left.

Q   All right. Was it your understanding that the officer had told you to leave the station?

A   I don't recall him saying leave the station. I think he said leave or -- I don't -- I don't recall that. I remember being, like, okay, this isn't going anywhere and -- and so we left.

Q   Well, why did you leave if he wasn't telling you to leave the station?

A   Because he wasn't letting us on the Metro, from what I can remember.

Q   And how was that? How was it that he was preventing you from getting on the Metro?

A   He kept arguing and saying that we weren't going to get on.

Q   So was he telling you to leave; is that what your understanding was?

MR. JACOB: Objection. She answered you.

BY MS. CAREY:

Q   Go ahead.

31

MR. JACOB: No. She answered you.

MS. CAREY: No.

MR. JACOB: Do you have another question?

MS. CAREY: No. I want the answer to this question.

MR. JACOB: Okay.

BY MS. CAREY:

Q   Did you understand that he was telling you to leave the station?

MR. JACOB: She already said, "No."

THE WITNESS: You know, I really -- I don't remember those exact words.

BY MS. CAREY:

Q   But you were intending to get on the train; however, you turned around and walked out?

A   Yes.

Q   Okay. So are you telling me that -- why did you leave? Let me ask that question.

A   Because, like I said, we weren't getting anywhere. We were arguing --

Q   I don't know what that means.

A   The argument kept --

32

Q   Tell me what you mean by that.

A   -- continuing. And if I wanted to stop and just get on the Metro, then he -- he was -- must have been preventing me from doing so.

Q   Well, I'm not asking you to guess. I want to know what he was doing to prevent you from getting on.

A   I just don't remember exact words. I'm sorry. I remember not getting on -- on the Metro because he said we couldn't, I guess.

Q   Did you have any conversation with -- strike that.

Did Mr. Wilson have any conversation with Officer Vinh at that -- during this initial interaction with him?

A   Yes.

Q   And what did he say?

A   I believe he started arguing with Mr. Vinh as well and then he backed off and I kept going with Vinh for a little bit longer before we left.

Q   And what -- what is your -- do you have any recollection of what Mr. Wilson was saying to the

33

officer?

A   I believe he was saying we have a right to do what we want; we weren't doing anything wrong and, you know, let us through.

Q   At any point did Officer Vinh physically prevent you from moving past him and going -- and getting onto the Metro in this initial interaction?

A   I don't believe so.

Q   Okay. Did he physically prevent Mr. Wilson from getting on the train?

A   Not that I remember.

Q   What was Ms. Weber doing during your and Mr. Wilson's interaction with Officer Vinh?

A   I don't recall.

Q   Okay. Do you recall having any conversation with Ms. Weber before you left the station?

A   I don't recall.

Q   And where did you go when you left?

A   I remember going up to the street.

Q   Okay. So you went all the way out of the station?

A   That's what I remember, yeah.

# Capital Reporting Company
## Ronkin, Karissa A. 04-18-2013

34

Q   And when you say "up to the street," did you -- where did you stop?

A   Right above the Metro, probably right around that area.

Q   And what did you do when you got up there?

A   We were discussing what to do, if we should go back out somewhere or just alternatives, well, what do we feel like doing now, you know.

Q   I'm sorry. I didn't hear that last sentence.

A   Alternatives or just, you know, figuring out what the next step was.

Q   What were the alternatives that you were discussing?

A   To go somewhere else and then --

Q   Do you mean some other entrance?

A   No, to some other restaurant or bar or something.

Q   Okay. And whose suggestion was that?

A   I don't -- I don't remember whose that was.

Q   All right. Besides --

A   It was just being tossed around.

35

Q   I'm sorry. Besides going to some other bar or restaurant, what were some of the other alternatives that you were discussing?

A   Really the only alternatives I recall talking about were to go somewhere else or, no, we really want to go home. We were just kind of like -- about the -- what happened with Vinh and we're like, okay, you know, take a time-out.

What do we actually feel like doing, checking in, and then we're like, no, we really want to go home, so.

Q   Did any -- did you discuss using another entrance to the Metro station?

A   It wasn't a discussion, no.

Q   Okay. So no one suggested using any other Metro stop or any other entrance to Gallery Place?

A   No. We didn't really find it necessary.

Q   And why was that?

A   We just thought we would go home on this Metro.

Q   But I want to know why you didn't think it was necessary to use another entrance.

36

A   It just wasn't a thought in our minds. If it was --

Q   I just want to --

A   -- we would have done it.

Q   I want to know what was in your mind. I don't want you to tell me what you assume was in someone else's. I want to know what you were thinking.

A   Yes. What I was thinking was should we go somewhere else; no, I really don't feel like it; yeah, okay, let's go home. And so we went back down to go home.

Q   Okay. And then all three of you went back down into the -- into the same Chinatown entrance of Gallery Place?

A   Yes.

Q   And what happened when you got down there?

A   I remember wanting to get through and Vinh preventing us -- Officer Vinh preventing us.

Q   Okay. When you say "get through," where did this occur?

A   To -- at the gate, I believe, just to put

37

our cards through.

Q   Okay. So you all proceeded to the fare gates?

A   Yes.

Q   And where was Officer Vinh when you did that?

A   I remember him standing in the same place behind the gate of where the fare cards are.

Q   Okay. The same place as what?

A   The --

Q   Where he was previously?

A   Yes.

Q   Okay. So your recollection was that he spoke to you from the other side of the fare gate originally?

A   That's what I remember, yeah.

Q   All right. And you were on -- you were still near the fare card machines during the initial encounter, correct?

A   Yes.

Q   All right.

A   To my recollection, yeah.

## Capital Reporting Company
### Ronkin, Karissa A. 04-18-2013

42

that's a poor question.

The first interaction with Officer Vinh is not on that video, correct, when you were trying to give Wilson a noogie?

A   Correct.

Q   Okay. And your first interaction with Officer Vinh, whatever conversation went on between you and Officer Vinh the first time, is also not on that video, correct?

A   Yes, correct.

Q   Okay. And your entrance into the rail station the first time is not on that video, right?

A   The first time?

Q   The first time you came through that evening --

A   Yes, correct.

Q   -- on your way home.

A   Yes.

Q   Okay. And the video picks up with you and Officer Vinh, Mr. Wilson and Ms. Weber at the fare gate machine during the second interaction, right?

A   Yes.

43

Q   When you watch that video, did you have any question in your mind as to whether it was accurate or not?

A   Accurate?

Q   Yes.

A   It was a video of what happened.

Q   Okay. So you're -- you don't have any concern that it's been altered or edited in any way?

A   No.

Q   Okay. So you watched it a week ago. Do you remember what the video had -- what information you got from the video regarding what you said to the officer at the fare gate?

A   I'm sorry?

Q   When you watched the video a week ago --

A   Yeah.

Q   -- do you remember what the video -- audio part of the video said -- showed that you said to the officer at the fare gate?

A   Yes.

Q   Okay. What did it -- what is your understanding of what was captured on that video?

44

A   Yes. In the video I remember hearing -- he said -- I believe Officer Vinh saying, "This is my station. Leave." And I said, "Okay, it's" -- "yeah, it's your fucking station." And then I turned around to leave, and then he started yelling at me and came up from behind me.

Q   So did he say any more than, "This is my station; leave"?

MR. JACOB: I'm going to object. I mean, if you want her to try to remember the video, that's fine, but the video is going to speak for itself, and that's the best evidence. If you want to show it to her, it might save some time here.

MS. CAREY: Okay. Thanks.

MR. JACOB: But if you want her to guess, she's free to guess.

MS. CAREY: I'm not asking her to guess.

THE WITNESS: That's really all I remember from the video. I -- I haven't watched it very much.

BY MS. CAREY:

Q   Were you intoxicated when you were inside the station the second time?

45

MR. JACOB: I'm going to object. Your definition of intoxicated?

BY MS. CAREY:

Q   Were you under the influence of alcohol? Did you feel drunk?

MR. JACOB: I'm going to object. That's two different --

MS. CAREY: She can --

MR. JACOB: -- two different questions. Compound question.

BY MS. CAREY:

Q   Okay. Did you feel drunk?

A   I don't know what you mean by that.

Q   Come on, Ms. Ronkin. Did you feel like you had too much to drink?

A   No.

Q   You didn't?

A   No.

Q   Okay. Did you ever -- did you ever acknowledge that you were drunk that night?

MR. JACOB: Object.

THE WITNESS: I -- in the video I said

## Capital Reporting Company
### Ronkin, Karissa A. 04-18-2013

46

something along those lines, and that's a separate issue. But I -- no, I don't believe I had too much to drink that night.

Q   Did you ever post anything on -- in response to the YouTube video?

A   I did.

Q   Okay.

MS. CAREY:  Would you mark -- actually, can we take a break for a minute?

VIDEO TECHNICIAN:  The time is now 11:58, and we're going off the record.

(Brief recess.)

(Ronkin Exhibit No. 1 was marked for identification.)

VIDEO TECHNICIAN:  The time is now 12:05 p.m., and we're on the record.

BY MS. CAREY:

Q   All right.  Ms. Ronkin, I've given you a document I've had the court reporter mark as Exhibit 1.  It's 48 pages of what I believe to be postings on YouTube in response to the video that was uploaded regarding the second part of your incident with

47

Officer Vinh.

Have you reviewed any of these postings before today?

A   A year ago or so I read through some of them.

Q   All right.  Would you turn to Page 13 of Exhibit 1.

A   Okay.

Q   And there is a posting in the middle of the -- of Page 13 that appears to be from savyfinfin, S-A-V-Y-F-I-N-F-I-N.

Is that you?

A   Yes.

Q   Okay.  And did you post this?

MR. JACOB:  Which one are we referring to?

BY MS. CAREY:

Q   All right.  I'll read it, and you tell me if this is your posting.

A   Okay.

Q   "I told my lawyer for the case about how I was arrested, and he said that it didn't matter, that he could arrest me however he wanted and I was still

48

in the wrong.  Jail was fucked up and this system is fucked up and I'm still raving mad about it.  I just thought there was nothing else I could really do.

"If anyone had any ideas or information though, I would certainly be open to it.  The cop comes into the restaurant I serve at all the time and he still makes he sick, Savyfinfin."  And then it says, "One year ago."

Was that your posting?

A   Yes.

Q   Okay.  Further down on the page at the very last -- at the very end of Page 13, is this your posting:  "Hey, y'all.  I'm the girl from the video, and I just wanted to thank you for your support.

"I was a drunk idiot in the clip, and I know I was partially in the wrong, but let me tell you that the cop was a complete ass.  And if he was first --

MR. JACOB:  "And he was."

BY MS. CAREY:

Q   "He was the first to approach me with the opening line of, 'If you want to fuck around, get the fuck off my Metro,'" end quotes.  "So the

49

confrontation was pretty aggressive from the start anyway."

Is that your posting?

A   Yeah.  I believe it was posted before the one that you read.

Q   All right.

A   It's, like, the opposite.

Q   But they're both posted by you, right?

A   Yes, just in the opposite order.

Q   Okay.  So you said, "I was a drunk idiot in the clip"; is that true?

MR. JACOB:  True that she said it or true that she was a drunk idiot?

MS. CAREY:  True that she was a drunk idiot.

MR. JACOB:  Just so we're clear on the record.

MS. CAREY:  Is that clear enough?

THE WITNESS:  No.

BY MS. CAREY:

Q   No.  So what did you mean by that?

A   I meant that -- I mean, I -- the realty is -- is that I had two beers, and I meant that I

# Capital Reporting Company
## Ronkin, Karissa A. 04-18-2013

110

A -- maybe.

Q He's not straddling you at this point in the video, correct?

A I -- I think so.

MR. JACOB: I'm going to object. That's --

THE WITNESS: I see, like, two arms.

MS. CAREY: Okay. And this is --

MR. JACOB: I'm going to object.

MS. CAREY: -- 3:13.

All right. Go ahead, counsel. I have 3:13. What's your objection?

MR. JACOB: The video is going to show what it shows. For us to interpret is not our point here.

BY MS. CAREY:

Q Did you just ask Sarah to get the hair out of your face?

A Yeah.

Q And she approaches you and moves your hair out?

A Uh-huh.

Q Yes?

A Uh-huh, yes.

111

Q What is Mr. Wilson doing?

A He -- I -- I wasn't really paying attention to him at the time. I know that his intention was to -- he thought he should be arrested, too, so.

VIDEO TECHNICIAN: You have five minutes on the videotape.

MS. CAREY: Thank you.

BY MS. CAREY:

Q Okay. Can you make out what you said there?

A I said, "I'm just 21. I didn't do anything wrong." I said, "I'm hammered" -- well, I'm -- and then I was like, "Ugh. I mean, I'm drunk, but, I mean, I'm not falling."

And then before -- if you let it play more, I know that I say, "I'm not, like, falling down."

Q Okay. Is that PBRs, $2 beers?

A Yes.

Q Okay. That's you, right, saying that?

A That would be me.

Q It's that two PBRs I had at the bar, was that you?

A Yes.

112

(Videotaped stopped.)

BY MS. CAREY:

Q Okay. So did Officer Vinh ever put ankle cuffs on you?

A Ankle cuffs?

Q Ankle --

A No.

Q Okay. Who put the -- I'm sorry. Who put the ankle cuffs on you?

A That was much later. That was -- that was -- the incident I was talking about was the next day.

Q Okay.

A Before court.

(Ronkin Exhibit No. 2 was marked for identification.)

BY MS. CAREY:

Q I want to show you what's been marked as Exhibit 2, and I'd ask you to take a look at that if you would.

MR. JACOB: Thank you.

MS. CAREY: I'm sorry.

113

BY MS. CAREY:

Q The next to the last page, which would be -- it looks like -- well, it's whited out on my copy. It looks like it's Page 16. It should be Page 16. It's -- it says "verification" on the top.

VIDEO TECHNICIAN: You have three minutes left on the videotape.

THE WITNESS: Yes.

MS. CAREY: Thank you.

BY MS. CAREY:

Q Is that your signature?

A Uh-huh.

Q Yes?

A Yes.

Q Okay. And it's dated January 11th, 2013, right?

A Yes.

Q Can you identify what this document is?

Well, let me ask you, is it your answers to written questions that were sent to you in this litigation by me?

A Yes.

1

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

------------------------------:
                              :
KARISSA A. RONKIN,            :
                              :
            Plaintiff,        :  Case No:
                              :
      vs.                     :  1:12-CV-00729 (RBW)
                              :
ANDY VINH,                    :
                              :
            Defendant.        :
                              :
------------------------------:


                              Washington, D.C.
                        Tuesday, March 12, 2013


Videotaped Deposition of:

              ANDREW JUSTIN WILSON

called for oral examination by counsel for Defendant,

pursuant to notice, at 600 Fifth Street, Northwest,

Washington, D.C., before Katherine Gyumolcs, RPR, of

Capital Reporting Company, a Notary Public in and for

the District of Columbia, beginning at 11:20 a.m.,

when were present on behalf of the respective parties:

Capital Reporting Company
Wilson, Andrew Justin 03-12-2013

**14**

evening?

A   I don't believe so, but I'm not a hundred percent certain.

Q   Do you recall whether anyone else that you know joined you at any point after you met up with Ms. Ronkin before this incident?

A   I only remember the three of us but that could be incorrect.

Q   After you left the Rocket Bar where did you go?

A   I believe directly to the Metro.

Q   And did you use the entrance directly across the street from the Rocket Bar?

A   Yes, ma'am.

Q   Do you -- at the time that this incident happened, were you a frequent user of the Metrorail system?

A   Absolutely.

Q   Do you know how many entrances there are to the Gallery Place subway stop?

A   At that point I don't believe I did.  I was still quite new to the city.

**15**

Q   And where were you intending to go?

A   I believe back to Brookland, which is where they lived.

Q   So you were intending to get on the red line in the direction of Glenmont or Silver Spring?

A   Yes, ma'am.

Q   And then from there where were you -- were you intending to stay in Brookland?

A   I'm not certain.

Q   All right.  Now, was Ms. Ronkin intoxicated by the time you left the Rocket Bar and walked across the street to the Gallery Place subway station?

MR. JACOB:  Objection.

MS. CAREY:  Okay.  Go ahead.

MR. JACOB:  That calls for a medical conclusion, but if you can guess, I'm sure you can.

BY MS. CAREY:

Q   I don't want you to guess.  I want to know whether you -- in your opinion, Ms. Ronkin was intoxicated at the time you walked across from the Rocket Bar to the Gallery Place subway station.

MS. CAREY:  Your objection is noted.

**16**

MR. JACOB:  Same objection.  It calls for a medical opinion.

THE WITNESS:  I agree.  I'm in no shape to guess at that.

BY MS. CAREY:

Q   Okay.  So you have no idea whether she (sic) felt that she was drunk or appeared to be drunk?

MR. JACOB:  Objection.  How would he know how she felt?

MS. CAREY:  I'm asking him.

BY MS. CAREY:

Q   Go ahead, Mr. Wilson.  You can answer.

A   I'm going to go with him.  I really don't know.  It didn't appear when we left that she was.

Q   Okay.  So it didn't appear to you when you left the Rocket Bar and walked into the subway station that she was at all intoxicated?

A   I don't believe so.

Q   All right.  You entered the subway station directly after leaving the Rocket Bar, correct?

A   I believe so.

Q   And what happened when you went down into --

**17**

got off the escalator into the Gallery Place subway stop?  And this was 7th and H, correct?

A   Yes.

Q   Okay.

A   We -- Karissa and I already had money on our cards, so we didn't have to stop and get -- add any money to our card.  Sarah did.  Karissa and I's relationship is a bit like siblings so we have a tendency to joke around a bit.

So she came up behind me and kind of, like, jumped on my back, just goofing around because she's a bit of a goofball, and at that point we were approached by the police officer.

Q   All right.  And what were you doing as the officer approached you?

A   Standing, listening to him more than anything.

Q   And what was -- what did the -- this is Officer Vinh?

A   I imagine so.  I'm not sure of his name.

Q   All right.  Was there more than one police officer that approached you that evening?

Capital Reporting Company
Wilson, Andrew Justin 03-12-2013

18

A   There were some later, but at that point it was only him.

Q   And what did he say?

A   He said no horseplaying on my Metro, and at that point he asked us to leave. There may have been a little bit more discourse, but it was -- it seemed to me it was straight from no horseplaying on my Metro, get out of my Metro.

Q   After he said no horseplaying on my Metro, did you respond at all to him?

A   Like I said, there may have been a bit of discourse, but I don't remember it being extended at all.

Q   Well, my question wasn't whether it was extended. I just want to know, did you say anything to him after he said no horseplaying on my Metro?

A   I don't recall.

Q   Did Ms. Ronkin say anything?

A   I don't recall.

Q   And then he asked you to leave?

A   Yes.

Q   Okay. And did you respond to that verbally?

19

A   I don't recall.

Q   Did Ms. Ronkin respond?

A   I don't recall.

Q   Do you recall what Ms. Weber was doing while Officer Vinh was telling you no horseplaying on Metro?

A   As I said before, she was putting money on her Metro pass.

Q   So was she -- did she continue to be putting money on her Metro pass or has she turned to look to see what was happening at that time?

A   I absolutely don't recall what Sarah was doing.

Q   All right. What did you do that you recall next?

A   We went up the escalator. That was the next thing I remember after he asked us to leave.

MR JACOB: Could he clarify "we"?

THE WITNESS: Karissa, Sarah and I went up the Metro -- went up the escalator and left the Metro.

BY MS. CAREY:

Q   So you have no recollection of saying anything to him before you left the Metro station?

20

A   It was a bit of a charged situation. I don't remember exactly what was said or if anything was said.

Q   I'm sorry. I didn't understand what you said. It was a bit of a what?

A   It was a bit of a charged situation. He was very aggressive and we could have said something, but I don't remember exactly what it was.

Q   Describe what you mean by "very aggressive."

A   He seemed a bit as if -- let's see. How do I put this? So he came to two 20-year-olds that -- 20-something-year-olds that were in general just doing nothing to hurt anybody else and just started yelling at us for no good reason. At that point I don't remember much else until after we got out the escalator.

Q   Okay. So was it your impression at that time that he didn't have any authority to tell you no horseplaying on my Metro?

MR. JACOB: Objection. Calls for a legal conclusion.

BY MS. CAREY:

21

Q   Go ahead.

A   I don't know what his authority was at that point, but it was very much an overkill.

Q   Why do you say that? What do you mean by "an overkill"?

A   She -- it seemed to me that he could have gently asked us to or to -- to -- to calm down or quit playing. In general, we were two adults, one of which was just joking around and jumped on the other's back. I have seen it happen a million times on the Metro without anyone being yelled at. And he came to us directly as if, you know, he intended to focus on us for no very good reason.

And yeah, I mean, I definitely feel like it was an overly charged aggressive situation that was created by him that didn't need to be.

Q   And so did he escort you out of the station or did you simply turn and walk out of the station up the escalator?

A   I believe we ended up agreeing to just walk out, but he may have kind of walked and followed us.

Q   Okay. When you say "you ended up agreeing,"

Capital Reporting Company
Wilson, Andrew Justin 03-12-2013

22

did you have a discussion amongst yourselves as to whether you were going to leave or not at that point?

A   Well, I mean, agree in the sense that we were just, like, okay, we'll go.

Q   And what was your intention as you left the station on that first time?

A   To take the Metro.

Q   From which location?

A   The only location that I knew how to get to.

Q   So was it your intention then to come back into the Metro?

A   Yeah. Yeah, it was.

Q   And how were you intending to do that once the officer had told you to leave?

A   We gave him a few minutes and we kind of just figured it wouldn't be a big deal to walk back into the Metro.

Q   So was it clear to you that the officer had told you to leave the Metro at that point?

A   Yes, but he didn't give us a time frame. Like, he told us to leave but we were unaware that we couldn't go back immediately.

23

Q   Did you ask him if you could come back after a period of time?

A   He didn't make it clear one way or another.

Q   No, that wasn't my question. Did you ask him if you could come back?

A   No, I didn't. I wasn't aware that we needed to.

Q   So what happened when you got -- well, how far out of the station did you go?

A   We kind of just walked a bit away. I'm not sure very far (sic) and discussed what to do.

Q   Did you take an escalator out of the fare card area?

A   Yes.

Q   And did you actually go above ground --

A   Yes.

Q   You went completely out of the station, in other words?

A   Yes.

Q   All right. And where did you stop before you turned around and came back into the station?

A   I think we were just on the sidewalk.

24

Q   And what was the conversation at that point?

A   We were discussing how to get home and we didn't know a good alternative. None of us had cash for a cab and none of us really wanted to get cash out, so...

Q   Did anyone suggest another entrance to the subway station?

A   No.

Q   Did anyone have any question as to whether there was another entrance to the subway station?

A   It did not come up in conversation. I'm not sure -- looking back on it now, I'm not terribly sure any of us were aware that there were other entrances so close.

Q   So how long do you think you were above ground on the sidewalk having this conversation?

A   I don't recall.

Q   You have no idea whatsoever? Less than ten minutes or more than ten minutes?

A   I would say roughly ten minutes.

Q   Roughly ten minutes?

A   Uh-huh.

25

Q   In that ten minutes, what were you talking about?

A   How to get home.

Q   For ten minutes?

A   Yeah.

Q   Besides the fact that you didn't have money for a cab, what was the other discussion that you were having for that ten minutes?

A   Whether or not it would be okay to walk back into the Metro.

Q   Okay. What was the discussion as to that topic?

A   It was mainly, do you think it would be okay, yes, no, yes. I mean, it was an elongated -- maybe it wasn't ten minutes, but it certainly seemed like we were up there for a while.

Q   Did anyone disagree with the idea to come back into the Metro system?

A   I don't believe so, no.

Q   Okay. So then did the three of you return?

A   Yes.

Q   And did Ms. Weber at that point already have

**METROPOLITAN POLICE DEPARTMENT**
Washington, D. C.

ARREST/PROSECUTION REPORT

P.D. 163 Rev3/2008                                    G.O. 401.5

| | |
|---|---|
| 1. PERSON NOTIFIED OF NAME CHANGE – UNIT – DATE/TIME – NCIC NO. (ID ONLY) | 2. ID NUMBER (ID ONLY) ▸ |
| 3. DEFENDANT'S TRUE NAME – LAST, FIRST, MIDDLE (ID ONLY) | 4. CID NUMBER |

5. UNIT-ARREST NO.
511000801

6. DEFENDANT'S NAME – LAST, FIRST, MIDDLE (At time of arrest)
RONKIN, KARISSA A.

7. DEA LAB NUMBER

| 8. Arresting Officer's Name | 9.TYPE OF RELEASE | 10. NICKNAME / ALIAS | |
|---|---|---|---|
| VINH, ANDY B. | ☐ CITATION ☐ BOND ☐ COLLATERAL | ▸ | 11. PHONE NUMBER 609-922-2865 |

| Rank | Badge # | Agency | 12. COURT DATE |
|---|---|---|---|
| OFC | 522 | MTPD | |

13. ADDRESS (Include Room / Apt. No. City & State if Outside D.C.)
▸ 1036 NEWTON ST., NE WASHINGTON DC

14. TIME IN D.C.

| 15. ☐ CHILD ABUSE | ☐ GANG SPECIAL INTELLIGENCE | ☐ HATE | ☐ SENIOR CITIZEN | ☐ DOMESTIC VIOLENCE | 16. SEX ▸ Female | 17. RACE ▸ White | 18. BIRTHDATE ▸ | 19. SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|---|---|

| 20. NEED INTERPRETER ☐ YES ☒ NO | 21. HEIGHT 5'08 | 22. WEIGHT 165 | 23. HAIR BRN | 24. EYES BRN | 25. COMPLEX Light | 26. PERMIT NO/ST R641242561608882 | 27. BIRTHPLACE (City & State) VORHEES, NJ |
|---|---|---|---|---|---|---|---|

28. CO-DEFENDANTS: Number 0 (If more than 3, list on back)
NAME, ADDRESS, ZIP CODE AND PHONE NUMBER

| 29. IMPERSONATOR? ☐ M ☐ F ☒ NO | 30. ETHNICITY | 31. CAUTION |
|---|---|---|

1.

32. SCARS/MARKS/TATTOOS
N/A

2. ,

| 33. HAT N/A | 34. JACKET N/A | 35. PANTS N/A |
|---|---|---|

3. ,

| 36. COAT N/A | 37. SHIRT N/A | 38. SKIRT/DRESS FLORAL DRESS |
|---|---|---|

39. WALES/NCIC CHECK

CHECK MADE BY (Name)
OFC SNEAD, E.

NCIC NUMBER
242061450

WARRANT ON FILE (If Yes, enter Warrant Numbers)
Yes ☐ No ☒

| 40. LOCATION OF OFFENSE (Exact Address, include Room / Apt No.) ▸ 630 H ST., NW WASHINGTON DC 20003 | DATE OF OFFENSE ▸ 09/16/10 | TIME OF OFFENSE ▸ 2245 HRS |
|---|---|---|
| 40. LOCATION OF ARREST (Exact Address, include Room / Apt No.) ▸ 630 H ST., NW WASINGTON DC 20003 | DATE OF ARREST ▸ 09/16/10 | TIME OF ARREST ▸ 2250 HRS |

42. ASSISTING OFFICER'S NAME, RANK, BADGE NO. & UNIT OR AGENCY
▸

ASSISTING OFFICER'S NAME, RANK, BADGE NO. & UNIT OR AGENCY
▸

43. DEFENDANT ADVISED OF RIGHTS

| DATE | TIME | LOCATION | OFFICER'S NAME – ADVISING / COMPLETING PD FORM 47/47A | BADGE NO. | UNIT |
|---|---|---|---|---|---|

44. COMPLAINANTS / WITNESSES (If sworn member – Name, Rank, Badge No. and Unit)   MORE ☐   See Back

| NAME – LAST, FIRST, M.I. | ADDRESS – STREET, CITY, STATE, ZIP CODE | BIRTHDATE | HOME PHONE NO. | WORK PHONE NO. |
|---|---|---|---|---|
| W-1 ▸ WMATA | 600 5TH ST. NW, WASHINGTON DC | | | 202-962-2121 |
| W-2 ▸ CIACCIO, MICHAEL | 6207 ARKENDALE RD. ALEXANDRIA VA | | 832-277-0725 | |

| 45. SPEC. OPS NONE | 46. TACTICS | 47. PREMISES | 48. SCHOOL ZONE ☐ PUBLIC HOUSING ☐ |
|---|---|---|---|

| ENTER THE LEAD CHARGE FIRST | CHARGES | NOI OR WARRANT NUMBER | CCN | MPD DISPOS. | COLLA./BOND RECEIPT NO |
|---|---|---|---|---|---|
| | 1. DISORDERLY CONDUCT/PUBLIC INTOXICATION | | | | |
| | 2. UNLAWFUL ENTRY | | | | |
| | 3. | | | | |
| | 4. | | | | |
| | 5. | | | | |

50. PROPERTY RECOVERY / ITEMS OF EVIDENCE

| PROPERTY BOOK/ PAGE NO. | CSES NO. | 51. INITALS – DATE – UNIT OF PERSON TAKING PRINT | 53. RIGHT THUMB PRINT |
|---|---|---|---|
| | | 52. M. O. WEAPONS, HANGOUTS, HABITS, INSTRUMENTS | |

| 54. CCB USE ONLY | HEIGHT | WEIGHT | HAIR | EYES | COMPLEX. | SCARS/MARKS/TATTOOS |
|---|---|---|---|---|---|---|

DISTRIBUTION: Page 1 to ID & R : Page 2 & 3 to Prosecutor; Page 4, Unit Copy; Page 5 Officer's Copy

COMPLETE ALL REQUIRED FIELDS AND MAKE FIVE COPIES FRONT TO BACK

**55. EMPLOYMENT HISTORY** (List present employment if any, on Line 1)

| FROM –DATE –TO | EMPLOYER | ADDRESS | BUS. PHONE | OCCUPATION |
|---|---|---|---|---|
| 1. Present | UNEMPLOYED | | | |
| 2. | | | | |

**56. NAMES OF LIVING FAMILY, RELATIVES, FRIENDS AND ASSOCIATES** (Begin with immediate family)

| RELATIONSHIP | DOB/AGE | NAME – LAST, FIRST, M.I. | ADDRESS – STREET, CITY, STATE, ZIP CODE | PHONE NUMBER |
|---|---|---|---|---|
| MOTHER | 10/25 | KARLA RONKIN | 230 SUNNY JIM DR., MEDFORD, NJ 09055 | 609-953-3782 |
| FATHER | | CHUCK RONKIN | 230 SUNNY JIM DR., MEDFORD, NJ 09055 | 609-953-3782 |
| SISTER | 3/3 | HAYLEY RONKIN | 230 SUNNY JIM DR., MEDFORD, NJ 09055 | 609-953-3782 |

| 57. MILITARY SERVICE: BRANCH/DATE FROM – TO<br>N/A | 58. TELEPHONE CALL MADE<br>☐ YES  ☒ NO  ☐ REFUSED | 59. PHONE NUMBER<br>N/A |
|---|---|---|

**60. STATEMENT OF FACTS:** (Give a brief statement in your own words, of the facts surrounding the offense and the arrest. (Use Continuation Form PD 202A for additional space. Note present condition of any injured person(s). Do not give Witnesses' Names or Addresses. Refer to them as W1 or W2, etc as indicated in Item 31.)

The event occurred on 09/16/10 at approximately 2245 HRS at 630 H ST., NW WASINGTON DC 20003 in Washington DC.

THE UNDERSIGNED OFFICER OBSERVED THE DEFENDANT, IDENTIFIED AS KARISSA A. RONKIN, ENTER THE GALLERY PLACE / CHINATOWN METRO STATION AT THE 7TH ST. AND H ST. ENTRANCE. THE DEFENDANT BEGAN TO HORSE PLAY AND ROUGH HOUSE WITH HER BOYFRIEND BY THE FARE MACHINE CAUSING PATRONS TO FLEE AND OTHERS TO GATHER. THIS OFFICER APPROACHED THE DEFENDANT AND INSTRUCTED HER TO DISCONTINUE THE HORSE PLAY. THE DEFENDANT AND HER BOYFRIEND IGNORED THE INSTRUCTIONS AND CONTINUED TO ROUGH HOUSE. AT THIS TIME, THIS OFFICER NOTICE A STRONG ODOR OF AN ALCOHOLIC BEVERAGE COMING FROM HER PERSON. THIS OFFICER INFORMED THE DEFENDANT AND HER PARTY, THEY MUST LEAVE THE PREMISES AND NOT TO RETURN. THE DEFENDANT EXCLAIMED, "I'M 21 FUCKING YEARS OLD AND I CAN DO WHAT EVER THE FUCK I WANT!" THE DEFENDANT AND HER PARTY LEFT THE AREA. APROXIMATELY FIVE MINTUES LATER, THE DEFENDANT RETURNED AND WAS DETERMINED TO ENTER THE METRO SYSTEM. THIS OFFICER INFORMED THE DEFENDANT THAT IF SHE REFUSE TO LEAVE THE AREA, THEN SHE WOULD BE TAKEN INTO CUSTODY FOR UNLAWFUL ENTRY. THE DEFENDANT EXCLAIMED, "YOU ARE A FUCKING ASSHOLE, I'M 21 YEARS OLD!!" AT THIS TIME, THE DEFENDANT WAS TAKEN INTO CUSTODY. THE DEFENDANT WAS THEN TRANSPORTED TO METROPOLITAN DISTRICT 1 FOR FURTHER PROCESSING. ALL EVENTS OCCURRED IN WASHINGTON DC.

**61. DEFENDANT'S VERSION / REMARKS:** [What did defendant say about the offense or his/her whereabouts at the time of offense? (Use PD 118 for defendant's written statement.)]

| 62. RECORD CLERK'S NAME<br>OFC SNEAD, E. | 3. | 5. | 64. PROPERTY BOOK/PAGE NO.<br>PRISONER'S PROPERTY ONLY |
|---|---|---|---|
| ARREST RECORD SUMMARY | | | |
| 1.                2. | 4. | 6. | |

**65. BAIL REFORM ACT CASES:** Was a statement made by defendant in reference to his/her failure to appear? ☐ Yes ☐ no
(If yes, include in Defendant's Version/Remarks Section above.)

| 66. PRINTED NAME – OFFICER MAKING STATEMENT<br>VINH, ANDY B. | BADGE NUMBER<br>522 | RANK<br>OFC | 68. SIGNATURE OF REVIEWING OFFICIAL |
|---|---|---|---|
| 67. SIGNATURE OF OFFICER MAKING STATEMENT | UNIT<br>MTPD | DATE<br>9/17/2010 | UNIT                    DATE<br>1D              9.17 10 |

D.C. Courts Home

## Court Cases Online

Case Search for Person: RONKIN, KARISSA

**Click here to view search criteria**

Search retrieved 1 case in less than a second.

All retrieved cases available for view

**Click here to view search results**

Viewing single case; Details retrieved in less than a second.

**Click here to view case summary**

| 2010 CMD 017407: United States Vs. RONKIN, KARISSA A | |
|---|---|
| Case Type: Misdemeanor | File Date: 09/17/2010 |
| Status: Closed | Status Date: 09/17/2010 |
| Disposition: Dismissed-Nolle-Prosequi | Disposition Date: 10/07/2010 |

| Party Name | Party Alias(es) | Party Type | Attorney(s) |
|---|---|---|---|
| RONKIN, KARISSA A | | Defendant (Criminal) | SULTAN, ADNAN |

| Docket Date | Description | Messages |
|---|---|---|
| 10/07/2010 | Event Resulted - Release Status: | Event Resulted - Release Status:<br>The following event: Misdemeanor Initial Status Hearing scheduled for 10/07/2010 at 9:30 am has been resulted as follows:<br><br>Result: Dismissed - Nolle<br>Judge: CUSHENBERRY Jr, HAROLD Location: Courtroom 321 |
| 10/07/2010 | Case Disposed - Nolle Prosequi | Case Disposed - Nolle Prosequi |
| 10/07/2010 | Charge Disposed - Nolle Prosequi | Charge Disposed - Nolle Prosequi |
| 10/07/2010 | Charge Disposed - Nolle Prosequi | Charge Disposed - Nolle Prosequi |
| 09/17/2010 | Stay Away Order Filed | Stay Away Order Filed |
| 09/17/2010 | Release Conditions | Release Conditions |
| 09/17/2010 | CJA Contribution Ordered | CJA Contribution Ordered- not signed. Defendant is represented by Student Attorney |
| 09/17/2010 | Attorney Appointed/Dismissed | Attorney Appointed<br>Attorney SULTAN, ADNAN representing Defendant (Criminal) RONKIN, KARISSA A as of 09/17/2010 |
| 09/17/2010 | Event Resulted - Release Status: | Event Resulted - Release Status: PR.<br>The following event: Arraignment scheduled for 09/17/2010 at 1:00 pm has been resulted as follows:<br><br>Result: Defendant Pled Not Glty Trial Rights Were Asserted<br>Judge: HOWZE, KAREN Location: Courtroom 201<br>KARISSA A RONKIN (Defendant (Criminal)); ; Judge KAREN HOWZE on behalf of Judge HAROLD CUSHENBERRY Jr |
| 09/17/2010 | Event Scheduled | Event Scheduled<br>Event: Misdemeanor Initial Status Hearing<br>Date: 10/07/2010 Time: 9:30 am<br>Judge: CUSHENBERRY Jr, HAROLD Location: Courtroom 321 |
| 09/17/2010 | Charge Filed | Charge Filed<br>Charge #2: Disorderly Conduct |
| 09/17/2010 | Charge Filed | Charge Filed<br>Charge #1: Unlawful Entry |
| 09/17/2010 | Event Scheduled | Event Scheduled<br>Event: Arraignment<br>Date: 09/17/2010 Time: 1:00 pm<br>Judge: HOWZE, KAREN Location: Courtroom 201 |

She was obviously resisting arrest. If she had cooperated the whole incident would have been avoided. There is no abuse of authority going on. In fact the officer demonstrated restraint. (Her friends were annoying me.) Public intoxication and drunk/disorderly conduct is a crime people.

1 year ago

This is an outrage. Fake wannabe cops with control issues!!!!

1 year ago

This is an outrage. Fake wannabe cops!!!!

1 year ago

Poor lighting?

1 year ago

u like that tat on her ass dont you

in reply to                              1 year ago

Comment removed
Author withheld

i told my lawyer for the case about how i was arrested and he said that it didnt matter, that he could arrest me however he wanted and i was still in the wrong. jail was fucked up and this system is fucked up and im still raving mad about it; i just thought there was nothing else i could really do. if anyone had any ideas or information though i would certianly be open to it, the cop comes into the restaurant i serve at all the time, and he still makes me sick

1 year ago

Your lawyer is the type of example of this corrupt system we have. it's just sad.

in reply to                              1 year ago

he was humping you did you like it

in reply to                              1 year ago

@savyfin I have no clue about American Law but maybe you could sue them for sexual discrimination. if you look exactly at video...

in reply to                              1 year ago

hey yall, im the girl from the video and i just wanted to thank you for your support. i was a drunk idiot in the clip and i know i was partially in the wrong but let me tell you that the cop was a complete ass, and he was the first to approach me with the opening line of, "IF YOU WANNA FUCK AROUND, GET THE FUCK OFF OF MY METRO" so the confrontation was pretty aggressive from the start. anyway,

1 year ago

Welcome to Obama's America.

1 year ago

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KARISSA A. RONKIN,** | **: NO.: 1:12-cv-00729-RBW** |
| **Plaintiff** | **: (District Judge: Reggie B. Walton)** |
| | **:** |
| **v.** | **: CIVIL ACTION - LAW** |
| | **:** |
| **ANDY B. VIHN,** | **: JURY TRIAL DEMANDED** |
| **Defendant,** | **: (Electronically Filed)** |

## OBJECTIONS AND ANSWERS OF PLAINTIFF TO DEFENDANT'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Plaintiff, Karissa A. Ronkin, by and through her undersigned counsel, hereby responds to Defendant's First Set of Interrogatories and Requests for Production of Documents with the following Objections and Answers:

## GENERAL OBJECTIONS

1.     Plaintiff objects to Defendant's Interrogatories and Requests for Production of Documents to the extent that they seek disclosure of information protected by the attorney-client privilege or the attorney work product doctrine.

2.     Plaintiff objects to Defendant's Interrogatories and Requests for Production of Documents to the extent that they seek disclosure of mental impressions, conclusions, or opinions, respecting the value or merit of a claim or defense or respecting strategy or tactics as protected by the Federal Rules of Civil Procedure.

**OBJECTION:** Plaintiff does not have a specific record of the dates of service. However, Plaintiff is signing a release authorizing the Defendant to obtain the records in question directly from the provider.

13.    If you contend that a previous injury or condition was aggravated by the alleged incident, describe such condition and give the names and addresses of physicians who treated you and the approximate dates of such treatment.

**ANSWER:** N/A

14.    Itemize the expenses made or incurred by you as a result of the alleged incident, including all medical bills and loss of earnings, and attach copies of bills or statements in support of each item.

**ANSWER:** Plaintiff missed her first day of work at Bar Louie. In addition, Plaintiff incurred travel costs related to the need to present for Court Ordered drug testing and therapy. Plaintiff will supplement this response with the exact amounts, if/when such information is discovered.

## VERIFICATION

I, Karissa A. Ronkin, do hereby state that the facts set forth in the foregoing Plaintiff's Objections and Answers to Defendant's First Set of Interrogatories are true and correct to the best of my knowledge, information and belief.


___1/11/13___
Dated:

_____
Karissa A. Ronkin