# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
)
KARISSA A. RONKIN,                          )
                                            )
                 Plaintiff,                 )
       v.                                   )        Civil Action No. 12-729 (RBW)
                                            )
ANDY B. VIHN[1]                             )
                                            )
                 Defendant.                 )
———————————————————————  )

## MEMORANDUM OPINION

The plaintiff, Karissa Ronkin, brings this action against defendant Andy Vinh, a

Washington Metropolitan Transit Authority ("WMATA") police officer, pursuant to 42 U.S.C. §

1983 (2012), alleging constitutional and common-law violations arising from her September 16,

2010 arrest for unlawful entry and disorderly conduct while in the WAMATA Gallery Place

Metrorail Station (the "Gallery Place Station").  See generally Complaint ("Compl.").  Currently

before the Court is Defendant Vinh's Motion for Summary Judgment ("Def.'s Mot.") as to all of

the plaintiff's claims, and the Motion of Plaintiff Karissa A. Ronkin for Partial Summary

Judgment ("Pl.'s Mot.") on Counts II and III of her complaint.  After carefully considering the

parties' submissions,[2] the applicable legal authority, and the record in this case, the Court

---

[1] The plaintiff incorrectly captioned this case "Karissa A. Ronkin v. Andy B. Vihn" in her complaint and as a result of this error the case was docketed as such.  However, because the appropriate spelling of the defendant's last name is "Vinh," the Court uses the correct spelling in its Order.

[2] In addition to the filings already mentioned, the Court considered the following submissions in rendering its decision:  (1) the Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."); (2) the defendant's Statement of Material Facts Not in Dispute ("Def.'s Facts"); (3) the Brief in Support of Motion of Plaintiff Karissa A. Ronkin for Partial Summary Judgment ("Pl.'s Br."); (4) Plaintiff Karissa A. Ronkin's Statement of Undisputed Material Facts ("Pl.'s Facts"); (5) the plaintiff's Brief in Opposition to the Motion of Defendant for Summary Judgment ("Pl.'s Opp'n"); (6) Plaintiff Karissa A. Ronkin's Response to the Defendant's Statement of Facts ("Pl.'s Resp. Facts"); (7) Defendant Vihn's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Opp'n"); (8) the Defendant's Response to Plaintiff's Statement of Material Facts not in Issue ("Def.'s Resp. Facts"); (9) the Reply Brief in Support of Motion
(continued . . . )

concludes for the following reasons that the plaintiff's motion must be denied in its entirety and the defendant's motion must be granted in part and denied in part.

## I. BACKGROUND

The events preceding the plaintiff's arrest are largely uncontested. On the evening of September 16, 2010, the defendant was employed as a WMATA Transit Police Officer, and was on duty at the Chinatown entrance of the Gallery Place Station. Def.'s Facts ¶¶ 1–2; Pl.'s Facts ¶ 3. At approximately 10:00 p.m.,[3] the plaintiff and two of her friends entered the Gallery Place Station through the Chinatown entrance. Pl.'s Facts ¶ 6; Def.'s Facts ¶ 2. The "[d]efendant observed [the plaintiff] and her friends . . . horse-playing, so he advised the group that horse-playing needed to be taken outside." Pl.'s Facts ¶ 7; Def.'s Facts ¶ 5. The plaintiff took offense to the defendant's tone, resulting in them engaging in a heated verbal exchange. Id. ¶¶ 9–11; Pl.'s Resp. Facts ¶ 6; see Def.'s Mem., Exhibit ("Ex.") 1, (Deposition of Karissa A. Ronkin ("Ronkin Depo.")) at 28:3–29:22. Following the verbal exchange, the defendant "told . . . [the plaintiff] and her party to go ahead and catch a cab and leave the station and not utilize the station." Pl.'s Br., Ex. 2 (Deposition of Andy Vinh ("Vinh Depo.")) at 31:3–9; id. at 52:16–53:12; Pl.'s Resp. Facts ¶ 9. The plaintiff and her friends then left the station,[4] Pl.'s Facts ¶ 15, but the defendant was unaware that the plaintiff had fully exited the station at this time. See Pl.'s

---

( . . . continue)
of Plaintiff Karissa A. Ronkin for Partial Summary Judgment ("Pl.'s Reply"); and (10) Defendant Vinh's Memorandum of Points and Authorities in Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Def.'s Reply").

[3] The plaintiff indicates that the time was 10:00 p.m., Pl.'s Facts ¶ 6, whereas the defendant indicates it was 10:50 p.m., Def.'s Facts ¶ 2. While the Court notes this discrepancy, it is not material to the Court's analysis.

[4] The plaintiff admits only that she "and her friends chose to leave the [m]etro [station] for a period of time," Pl's Resp. Facts ¶ 7, not that the defendant told her to leave, id. However, the plaintiff's brief, her statement of material facts, and her deposition testimony concede that the defendant did tell her to leave the station. See, e.g., Pl.'s Br. at 4–5; (the "plaintiff complied with [the defendant's] directive to leave the station"); Pl.'s Facts ¶ 15 (same); Def.'s Mem., Ex. 1 (Ronkin Depo.) at 30:1–32:10 ("I remember not getting . . . on the [m]etro because he said we couldn't, I guess").

Br., Ex. 2 (Vinh Depo.) at 43:2–12.  The defendant did not explicitly tell the plaintiff that she could not come back into the station, Pl.'s Br., Ex. 2 (Vinh Depo.) at 38:20–39:4; Pl.'s Facts ¶ 8, instead, she was told to leave and to take a taxi, Pl.'s Br., Ex 2 (Vinh Depo.) at 52:16–53:12; Pl.'s Facts ¶ 21.

"[A]pproximately five minutes after [the plaintiff] left,  the [WMATA station] manager [said to the defendant] . . . , 'hey, . . . didn't you tell that girl[, the plaintiff,] to leave,'" Pl.'s Facts ¶ 16; see Def.'s Facts ¶ 8, whereupon the defendant told the plaintiff, "'I told you to leave, go ahead and leave; don't come through the station.'  [The plaintiff] refused to adhere to [the defendant's] warnings to her . . . [and] she demanded that she wanted to use the station," Pl.'s Mot., Ex. 2 (Vinh Depo) at 41:22–42:4; Pl.'s Resp. Facts ¶ 9; see also Pl.'s Facts ¶¶ 21–22. According to the defendant, the plaintiff stated, "I'm [twenty-one] fucking years old[,] I can do whatever I want[,] I want to ride the Metro system."[5]  Pl.'s Facts ¶ 23; Def.'s Facts ¶ 11.  At that point, the defendant began repeatedly "yell[ing] at [the plaintiff] to 'take a cab,' and that 'this is my station, leave,' and in response, [the plaintiff] stated, 'It is your fucking station . . . yeah' and then turned around and began to walk away from the [d]efandant back toward the exit as instructed."  Pl.'s Resp. Facts ¶ 11; Def.'s Facts ¶ 10.  "[W]hile [the plaintiff] made the statement [it's your fucking station . . . yeah,] . . . [the defendant] decided to place [her under arrest]."  Pl.'s Facts ¶ 31; Def.'s Resp. Facts ¶ 31.  Part of the encounter was recorded by an unknown person,

---

[5] The plaintiff's counsel represents that this response was given by the defendant "after being counseled by his attorney during an unscheduled break in his deposition."  Pl.'s Facts ¶ 23.  Based upon plaintiff's counsel's representation, the Court reviewed the cited testimony and discovered that the line of questions immediately preceding this break pertained to the defendant's opinion that he "did not believe that it was lawful for [the plaintiff] to come down into the station [the second time]."  Pl.'s Br., Ex. 2 (Vinh Depo) at 59:7–21. Moreover, after the break, when asked if there was "anything about your answer you would like to change now that you have been counseled by your attorney?" the defendant responded "[n]o change, sir," to which the plaintiff's attorney replied "[o]kay[, l]ets move on, then."  Id. at 61:4–8.  The plaintiff's counsel's representation concerning the events surrounding the defendant's testimony about the plaintiff's statement seems disingenuous in light of counsel's representation that "the [d]efendant's statement of facts contain several 'factual' statements that are not supported by the record and appear intended to mislead the Court."  Pl.'s Opp'n at 2.

see Pl.'s Br., Ex. 3 (YouTube Recording), and the recording was later posted on YouTube by an unknown person, Def's Facts ¶ 16; Pl.'s Resp. Facts ¶ 16.

### A. The Plaintiff's Arrest

While the parties generally agree about the events that preceded the plaintiff's arrest, their stories dramatically diverge as to the circumstances of the arrest. The defendant explains that after making the decision to arrest the plaintiff he "repeatedly state[ed] 'come here, come here' while reaching for [the plaintiff]." Def.'s Resp. Facts ¶ 34; Pl.'s Facts ¶ 34. According to the defendant, the plaintiff "push[ed] [the d]efendant away, t[old] him to get off of her and . . . her resistance caused them both to fall on the floor." Def.'s Resp. Facts ¶ 35. The defendant contends that when the plaintiff pushed him, he "los[t] his balance while reaching for her, and as a result of [the plaintiff's] physical attack on [him], and her physical resistance to him, both fell to the floor." Id. ¶ 36. And while the defendant admits that the plaintiff had not engaged in conduct the allowed him to "take [the plaintiff] to the ground," id. ¶ 37; Pl.'s Facts ¶ 37, "he [alleges that he] did not use a take down to subdue [the p]laintiff," Def.'s Resp. Facts ¶ 37. The plaintiff, on the other hand, maintains that the defendant used a take-down maneuver whereby he "grabbed her around the neck[] and threw her to the ground." Pl.'s Facts ¶ 36.

Following the plaintiff's arrest, she was "charged with unlawful entry and disorderly conduct/public intoxication." Def.'s Facts ¶ 17; Pl.'s Facts ¶ 42. However, "[t]he prosecuting attorney entered a nolle prosequi on both charges on October 7, 2010." Def.'s Facts ¶ 18; Pl.'s Resp. Facts ¶ 18. The plaintiff filed her complaint in this Court on May 7, 2012. Def.'s Facts ¶19; Pl.'s Resp. Facts ¶ 19; see Compl. at 14.

## II. STANDARDS OF REVIEW

Before granting a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, a court must find that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).

When ruling on a motion for summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Anderson, 477 U.S. at 255 (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." Id. The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to a summary judgment motion, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, the non-moving party must not rely on "mere allegations or denials . . . but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson, 477 U.S. at 248 (second omission in original) (citation and internal quotation marks omitted). "The mere existence of a scintilla of

evidence in support of the [non-moving party's] position [is] insufficient" to withstand a motion for summary judgment, but rather "there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

### III. LEGAL ANALYSIS

#### A. The Plaintiff's Constitutional Claims

To establish a claim against the defendant under 42 U.S.C. § 1983, the plaintiff must show that the defendant, while acting under color of state law, deprived her of the "rights, privileges, or immunities secured by the Constitutions and law" of the United States. 42 U.S.C. § 1983. To that end, the plaintiff asserts claims that the defendant violated: (1) her First Amendment Right to criticize the police; (2) her Fourth Amendment Right when he arrested her without probable cause, but rather in retaliation for her criticism; (3) her Fourth Amendment Rights when he used excessive force when arresting her; and (4) her Fourth Amendment Rights to be free from malicious prosecution. See generally Compl. ¶¶ 41–79. She now moves for partial summary judgment with respect to her second and third claims. See Pl.'s Mot. at 1. The defendant, on the other hand, contends that he is entitled to summary judgment as to all four of her constitutional claims because he is shielded from suit by qualified immunity. Def.'s Mot. at 1.

Qualified immunity is "an immunity from suit rather than a mere defense to liability." Hunter v. Bryant, 502 U.S. 224, 227 (1991). Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The doctrine "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or

those who knowingly violate the law.'" Ashcroft v. al-Kidd, ___ U.S. ___, 131 S.Ct. 2074, 2085 (2011) (citation omitted). Put succinctly, defendants are entitled to qualified immunity unless the plaintiff alleges (1) a violation of a constitutional right that (2) was "clearly established" at the time of the violation." Saucier v. Katz, 533 U.S. 194, 201 (2001), modified on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." Reichle v. Howards, ___ U.S. ___, 132 S.Ct. 2088, 2093 (2012). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. at 236.

Once a defendant asserts the defense of qualified immunity, "the burden then falls to the plaintiff to show that the official is not entitled to [it]." See Winder v. Erste, 905 F. Supp. 2d 19, 27–28 (D.D.C. 2012). In determining whether the legal rights at issue were clearly established at the time the events at issue occurred, a court must look to "cases of controlling authority in [its] jurisdiction." See id. If there is no such controlling authority, then the Court must determine whether there is "a consensus of cases of persuasive authority." Id.

Importantly, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Saucier v. Katz, 533 U.S. at 205. Recognizing this, the Supreme Court has stated that "[i]f [an] officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense." Id. "This accommodation for reasonable error exists because [officers] should not err always on the side of caution because they fear being sued." Hunter, 502 U.S. at 229 (internal quotation marks and citation omitted).

## 1. The Plaintiff's Fourth Amendment Unlawful Arrest Claim

Broadly, the defendant maintains that that he is entitled to qualified immunity as to all of the plaintiff's constitutional claims because "from the perspective of a reasonable police officer on the scene . . . [he] did not violate any [of the plaintiff's] constitutional rights . . . . [because u]nder the unlawful entry statute . . . [he] had probable cause to arrest her after she repeatedly refused his orders to leave the station and take a cab." Def.'s Mem. at 3. The plaintiff, in response, argues that "probable cause did not exist to arrest [the plaintiff] for . . . unlawful entry, . . . [so the Court should] enter judgment in [her favor] and against the [d]efendant." Pl.'s Br. at 7. Because it is well-established that "an arrest without probable cause violates the [F]ourth [A]mendment," <u>Martin v. Malhoyt</u>, 830 F.2d 237, 262 (D.C. Cir. 1987), the defendant is entitled to qualified immunity only if "a reasonable officer could have believed that probable cause existed" to arrest the plaintiff for either unlawful entry or disorderly conduct, <u>see</u> <u>Hunter</u>, 502 U.S. at 228. Thus, an officer who "reasonably but mistakenly conclude[s] that probable cause is present" is not civilly liable for making the arrest. <u>Hunter</u> 502 U.S. at 227 (citation omitted).

> The assessment of probable cause is an objective one [and a]n arrest is supported by probable cause if, 'at the moment the arrest was made, . . . the facts and circumstances within [the arresting officer's] knowledge . . . [was] sufficient to warrant a prudent man in believing' that the suspect has committed or is committing a crime.

<u>Wesby v. District of Columbia</u>, __ F.3d __, __, 2014 WL 4290316, *4 (D.C. Cir. 2014) (citing <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964) (second alteration in original)). "It must always be remembered that probable cause is evaluated 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" <u>Frazier v. Williams</u>, 620 F. Supp. 2d 103, 108 (D.D.C. 2009) (quoting and citing <u>Wolfe v. Perry</u>, 412 F.3d 707, 717 (6th Cir. 2005)). Thus, courts evaluating the existence of probable cause predicated on a violations of the District of

Columbia Code have been instructed to "evaluate[] the evidence from the perspective of the officer, not the plaintiff." Moorhead v. District of Columbia, 747 A.2d 138, 147 (D.C. 2000).

Because all of the plaintiff's constitutional claims are predicated on the conclusion that the defendant did not have probable cause to arrest her, the Court, therefore, first considers whether the "facts and circumstances [within the defendant's knowledge were] sufficient to warrant a man of reasonable prudence in the belief that" the plaintiff was committing the crime of unlawful entry or disorderly conduct. See Ornelas v. United States, 517 U.S. 690, 696–97 (1996) (finding that the existence of probable cause as applied to a particular set of facts is a legal question); Pitt v. District of Columbia, 491 F.3d 494, 501–02 (D.C. Cir. 2007).

### a. Unlawful Entry

At the time of the plaintiff's arrest, the defendant had a reasonable basis to believe that the plaintiff was committing the offense of unlawful entry. D.C. Code § 22–3302(b) (2010), which defines unlawful entry, provides that:

> Any person who, without lawful authority, shall enter, or attempt to enter, any public building . . . against the will of the . . . person lawfully in charge thereof or his agent, or being . . . thereon, without lawful authority to remain . . . thereon shall refuse to quit the same on the demand of the . . . person lawfully in charge thereof . . . shall be guilty of a misdemeanor . . . .

Thus, to make a valid arrest for an unlawful entry offense involving public property, an officer must reasonably believe that the plaintiff:  (1) entered or attempted to enter a public property; (2) did so without lawful authority;[6] (3) did so against the express will of the person lawfully in

---

[6] "Although there is little case law addressing the meaning of 'without lawful authority,' . . . it appears this element would protect from [arrest] for unlawful entry emergency responders, members of the law enforcement community entering pursuant to a warrant, or individuals otherwise authorized by law to enter certain properties." Ortberg v. United States, 81 A.3d 303, 307 n.5 (D.C. 2013) (internal citation omitted).

charge; (4) and had the general intent to enter.[7]  Culp v. United States, 486 A.2d 1174, 1176 (D.C. 1985); see also Barham v. Ramsey, 434 F.3d 565, 572 (D.C. Cir. 2006) (finding that an officer must have "enough information to warrant a man of reasonable caution" to believe that all elements of unlawful entry are present to have probable cause to arrest).

In this Circuit, if an officer "personally ask[s] the [p]laintiff[] to leave and the [p]laintiff[] . . . refuse[s], such a refusal would have supplied the probable cause the officer[] needed to make an arrest for unlawful entry." Wesby, __ F.3d at __, __ 2014 WL 4290316 at *8 (internal alterations, quotations, and citation omitted); see also District of Columbia v. Murphy, 631 A.2d 34, 37 (D.C. 1993) ("[T]he offense of unlawful entry includes . . . cases where a person who has entered the premises with permission subsequently refuses to leave after being asked to do so by someone lawfully in charge").  There is no requirement that once the will of the person lawfully in charge is "objectively manifest[ed] through either express or implied means, . . . [that it be] subjectively understood by the [offender]." Ortberg v. United States, 81 A.3d 303, 308 (D.C. 2013).

The plaintiff provides no legal support for her conclusion that the defendant did not have probable cause to arrest her for unlawful entry because he did not explicitly tell her that she couldn't reenter the Gallery Place Station that evening.  Moreover, and perhaps more importantly, the plaintiff's subjective understanding of what the defendant meant when he told her to "leave and take a cab" is not relevant to the Court's inquiry. Ortberg, 81 A.3d at 308.

---

[7] When the property at issue is public property, "in addition to a demand by the person lawfully in charge, [there must be] some additional specific factor establishing the party's lack of legal right to remain." Byrne v. United States, 578 A.2d 700, 701–02 (D.C. 1990) (internal quotation and citation omitted).  Nowhere in the plaintiff's three filings does she argue that she had a legal right to remain on the property after the first occasion when the defendant told her to leave the station.  While it is possible that the plaintiff alludes to this issue, given the fact that she is represented by an attorney and is not proceeding pro se, the Court cannot infer the presence of an argument that has not been specifically raised.  The Court therefore concludes that the plaintiff concedes that her self-described horse-play was adequately assessed as the necessary "specific factor [that] establish[ed her] lack of legal right to remain." Byrne, 578 A.2d at 701–02.

Instead, "the [C]ourt [must] evaluate[] the evidence from the perspective of the [defendant], not the plaintiff." Moorhead, 747 A.2d at 147; see also Frazier, 620 F. Supp. 2d at 108. And here, assuming the accuracy of the facts as asserted by the plaintiff and supplemented by exhibit two submitted with her brief in support of her motion for summary judgment, there is no question that the facts and circumstances known to the defendant would have justified a reasonable police officer to conclude, as the defendant did, that he had probable cause to arrest the plaintiff for unlawful entry because "she repeatedly refused his orders to leave the station and take a cab."[8] See Def.'s Mem. at 3.

As an initial matter, it is imperative, and likely dispositive, to note that the defendant was unaware of the fact that the plaintiff had fully exited the station prior to their second encounter and instead perceived that he "had already given her an instruction . . . to leave the station [so w]hen she came back, obviously she did not leave the station [completely]." Pl.'s Br., Ex. 2 (Vinh Depo.) 43:2–9. This fact, in and of itself, would establish probable cause to arrest her for unlawful entry based on his perception that she had implicitly "refused to leave." D.C. Code § 22–3302(b) (2010) (making it illegal for any person to remain on property against the will of the person lawfully in charge of it); see, e.g., Wesby, __ F.3d at __, 2014 WL 4290316 at *8; Murphy, 631 A.2d at 37. However, viewing all facts in the light most favorable to the plaintiff, even if the defendant was aware that she had fully exited the station, and even if the Court were to consider the plaintiff's argument that the defendant's initial order to leave was ambiguous as to the duration of her exile, the facts agreed to by the plaintiff and her exhibits clearly demonstrate that she was objectively disabused of any notion that she was permitted to return to

---

[8] The plaintiff places much emphasis on the fact that the defendant did not have the police powers to dictate how she got home that evening. However, she does not contest that he had the lawful authority to tell her to leave the station. Additionally, the Court need not consider her understanding of what was meant by the statement, "leave the station and take a cab." See Ortberg, 81 A.3d at 308.

the station that evening.  See, e.g., Pl.'s Br., Ex. 2 (Vinh Depo) at 61:17 ("[D]id I not ask you to

leave"); Pl.'s Facts ¶ 21 ("As she is getting close, I said, I told you to leave, go ahead and leave;

don't come through the station."); Pl.'s Resp. Facts ¶ 10 ("[T]he [d]efendant yelled at [the

plaintiff] to 'take a cab,' and 'this is my station, leave.'").  However, after receiving this

clarification, assuming clarification was needed, she once again verbally stated her refusal to

leave despite being "personally ask[ed] . . . to leave" a second time.  See, e.g., Pl.'s Facts ¶ 22

(responding to the defendant's instruction to leave, the plaintiff stated, "I want to go through the

Metro station"); id. ¶ 23 ("I'm [twenty-one] fucking years old[,] I can do whatever I want[,] I

want to ride the Metro system"); Pl.'s Br., Ex. 2 (Vinh Depo.) at 44:1–7 (in response, the

defendant said, "I told her to leave the station that first time," when being asked what "was

unlawful about her entry?"); id. at 50:4–14 ("I then made the determination that she is obviously

not going to listen to my first set of instructions, . . . [and decided] to stop her at the fare gates . .

. and . . . tell her to catch a cab and go home."); id. at 62:17–63:3 ("I told her, well, you need to

leave, go catch a cab home, . . . she refused, continued to go back and forth verbally with me . . .

she asked, who the fuck am I to stop her from going through . . . . I'm the police officer, this is

my station, leave."); id. at 63:20–64:4 ("I felt that she was not going to follow my first set of

instructions, not follow my second set of instructions, and she was definitely not going to follow

the third.  If we would continue to verbally argue . . . , it was unconstructive.  At that time I . . .

made the decision to place her under arrest.").

Thus, the plaintiff's own undisputed facts demonstrate that when she refused to leave the

second time despite the defendant's explicit instructions, it was reasonable for the defendant to

conclude that he had probable cause to arrest the plaintiff for unlawful entry.[9] See Wesby, __ F.3d at __, 2014 WL 4290316 at *8. Therefore, based solely on the plaintiff's undisputed facts and exhibits, the Court must conclude that at the time of the plaintiff's arrest, the facts and circumstances were sufficient to "warrant a prudent person to believe that the [plaintiff] ha[d] committed [the] offense" of unlawful entry by either refusing to leave or remaining on the premises when she was asked to vacate.[10] Thus, the Court must grant the defendant's motion for summary judgment on Count Two of the plaintiff's complaint and deny the plaintiff's motion for summary judgment on this claim.

### 2. The Plaintiff's Fourth Amendment Excessive Force Claim

The parties have also filed cross-motions for summary judgment on the plaintiff's claim that the defendant exercised excessive force in placing the plaintiff under arrest. See Pl.'s Mot. at 1; Def's Mot. at 1. The defendant argues that "a police officer has the right to use 'some degree of physical coercion' when effectuating an arrest," and therefore he "was justified in putting his hand on [the p]laintiff's shoulder, and holding her down on the floor after he and [the p]laintiff fell to the floor in the course of the arrest." Def.'s Opp'n at 5 (quoting and citing Oberwetter v. Hilliard, 680 F. Supp. 2d 152, 167 (D.D.C. 2010), aff'd, 639 F.3d 545, 555 (D.C. Cir. 2011)). The plaintiff, on the other hand, moves for summary judgment, arguing that "since

---

[9] The plaintiff also argues that that after being told to "'take a cab,' and 'this is my station, leave,'" Pl.'s Facts ¶ 29, she "stated '[i]t's your fucking station . . . yeah' and then turned around and began to walk away from the [d]efendant back toward[s] the exit as instructed," id. ¶ 30, and thus, because she ultimately complied with his instruction, any probable cause he may have had to arrest her was eviscerated and thus "fatal to his request for immunity," Pl.'s Opp'n at 4. However, the plaintiff's undisputed facts allege that the defendant made the decision to arrest her concurrent with her statement, and prior to her turning and walking away. Pl.'s Facts ¶ 30–31 ("The [d]efendant admits that it was while [the plaintiff] made [the] statement [it's your fucking station . . . yeah] that he decided to place her under arrest.") (emphasis added).

[10] Because an "arrest [is] valid, . . . if the [defendant] had probable cause to believe [the plaintiff] had committed any crime," United States v. Broadie, 452 F.3d 875, 881 (D.C. Cir. 2006) (citation omitted), the Court need not determine whether the defendant had probable cause to also arrest the plaintiff for disorderly conduct.

[the plaintiff's] arrest was not lawful, the [d]efendant did not enjoy a privilege to use any force, let alone excessive force." Pl.'s Br. at 8 (emphasis omitted).

An excessive force claim is evaluated under the Fourth Amendment, and the inquiry under the first step in <u>Saucier</u>, 533 U.S. at 201—whether a constitutional right has been violated—is governed by an objective reasonableness standard. <u>Graham v. Connor</u>, 490 U.S. 386, 396–97 (1989). Under this standard, "an officer has the authority to use 'some degree of physical coercion or threat thereof' during the course of an arrest, and 'not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." <u>Rogala v. District of Columbia</u>, 161 F.3d 44, 54 (D.C. Cir. 1998) (adopting the reasoning of the district court in <u>Kinberg v. District of Columbia</u>, No. 94–2516 (PLF), 1998 WL 10364 (D.D.C. January 5, 1998) (quoting <u>Graham</u>, 490 U.S. at 395–97)).

In determining whether an officer's use of force was reasonable, courts consider "the severity of the crimes at issue, whether the [plaintiff] pose[d] an immediate threat to the [] officer['s] or others[' safety], and whether [the plaintiff was] actively resisting arrest or attempting to evade arrest." <u>Graham</u>, 490 U.S. at 396. The severity of any injury sustained by the plaintiff is also a relevant factor.[11] <u>Wardlaw v. Pickett</u>, 1 F.3d 1297, 1304 n.7 (D.C. Cir. 1993) (stating that although the severity of injury "is not by itself the basis for deciding whether the force used was excessive, . . . it is a relevant factor").

Here, it is undisputed that the plaintiff did not engage in conduct that would have permitted the defendant to "take down" the plaintiff. Pl.'s Facts ¶ 37; Def.'s Resp. Facts ¶ 37;

---

[11] The parties dispute whether the plaintiff suffered any injury during her arrest. <u>Compare</u> Def.'s Facts ¶ 20 ("Plaintiff . . . has made no claim for medical expenses and required no medical attention as a result of the arrest on September 16, 2010."); <u>with</u> Pl.'s Resp. Facts ¶ 20 ("[The plaintiff] received mental health treatment."). And no documentation was provided to the Court by either party. In any event, there is a genuine issue of material fact as to whether the plaintiff sustained any injuries.

see Pl.'s Br., Ex. 2 (Vinh Depo.) at 103:9–12. Therefore, it is material to the resolution of the

pending cross-motions for summary judgment how and why the parties ended up on the ground.

The plaintiff asserts that the video conclusively shows that "the [d]efendant grabbed [the

plaintiff] from the back, around the neck and shoulders, jumped on her back, and tackled her to

the ground [where he] then proceeded to straddle [the plaintiff's] exposed buttocks for

approximately three minutes, while handcuffing [her] and pulling her hair." Pl.'s Br. at 8. On

the other hand, the defendant argues that the YouTube video conclusively demonstrates that the

"[p]laintiff ignor[ed the d]efendant['s] . . . order to 'come here,' . . . walking quickly away from

the [d]efendant, and when he put[] his hand on her shoulder, she pushed his arm away . . . ,

causing both of them to fall to the floor." Def.'s Opp'n at 6. Because the video does not

definitively support either parties' interpretations of the events portrayed in the video, a genuine

issue of material fact as to how and why the parties ended up on the floor of the station, and

therefore, the Court must deny both parties' motions for summary judgment on the plaintiff's

Fourth Amendment excessive force claim.

### 3. The Plaintiff's First Amendment Claim

The plaintiff asserts a First Amendment violation under the theory that because she was

arrested without probable cause, her arrest amounted to a retaliatory arrest for her criticism of the

defendant. See Compl. ¶¶ 41–50; Pl.'s Opp'n at 5; see generally Pl.'s Reply. This claim is

premised on her conclusion that "since probable cause did not exist to arrest [the plaintiff] . . . , it

is clear that the [d]efendant's actions resulted from his inability to control his anger when [the

plaintiff] criticized him." Pl.'s Opp'n at 5. She asserts that she "understands that [her First

Amendment claim] must be submitted to a jury," Pl.'s Opp'n at 5, and that summary judgment is

not appropriate based on the Supreme Court's interpretation of the First Amendment as related to

encounters between police officers and civilians as well as her attorney's experiences as a former police officer.  See Pl.'s Br. at 3.  The defendant, however, argues that he is protected from suite by qualified immunity as to the plaintiff's retaliatory arrest claim because at the time of the arrest he "had probable cause to arrest her after she repeatedly refused his orders to leave the station and take a cab." [12]  Therefore, the Court must determine whether the defendant (1) violated a right protected by the First Amendment and whether (2) that right was "clearly established" at the time of the plaintiff's arrest.  Saucier, 533 U.S. at 194.

Despite the plaintiff's arguments that "[t]he rights at issue here are 'clearly established,'" Pl.'s Reply at 2, in a case ignored by both parties, the Supreme Court recently concluded to the contrary. See Reichle, ___ U.S. at ___, 132 S.Ct at 2093 ("This Court has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause; nor was such a right otherwise clearly established at the time of . . . arrest.").  Other Circuits have used Reichle as the basis for upholding the dismissal of First Amendment retaliatory arrest claims when arrests were supported by probable cause.  See Galarnyk v. Fraser, 687 F.3d 1070, 1076 (8th Cir. 2012) ("[T]he district court did not err in holding the presence of probable cause to arrest Galarnyk for trespass defeated Galarnyk's First Amendment retaliatory arrest claim."); accord Moral v. Hagen, 553 F. App'x 839 (10th Cir. 2014) (upholding a finding of qualified immunity as to retaliatory arrest claims when probable cause existed); Thayer v. Chiczewski,

---

[12] It bears mentioning that, despite being raised by the defendant, the plaintiff never addressed the issue of whether her First Amendment rights were violated if in fact the defendant had probable cause to arrest her.  "Once a defendant asserts a defense of qualified immunity, the burden then falls to the plaintiff to show that the official is not entitled to qualified immunity."  Jones v. United States, 934 F. Supp. 2d 284, 293 (D.D.C. 2013) (citation omitted). The plaintiff cannot satisfy this burden by simply maintaining her position that probable cause did not exist and therefore the only conclusion to be drawn is that she was arrested for saying "it's your fucking station . . . yeah." The defendant having asserted that he had probable cause to arrest the plaintiff because "she repeatedly refused his orders to leave the station and take a cab," the plaintiff needed to presents facts that counter the defendant's stated basis for the arrest.  See Anderson, 477 U.S. at 248 (determining that the non-moving party must not rely on "mere allegations or denials . . . but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial.").

705 F.3d 237, 253 (7th Cir. 2012) (same).  More importantly, one year <u>after</u> the plaintiff's arrest, this Circuit "expressly declined to decide whether the absence-of-probable cause requirement . . . is 'best read as defining the scope of the First Amendment right' . . . ." <u>Moore v. Hartman</u>, 704 F.3d 1003, 1004 (D.C. Cir. 2013) (reaffirming its vacated holding in <u>Moore v. Hartman</u>, 644 F.3d 415 (D.C. Cir. 2011); <u>see also</u> <u>Moore v. Hartman</u>, 644 F.3d at 423 n.8 (noting that "[a]t least two circuits have required a no-probable-cause showing for First Amendment retaliatory <u>arrest</u> claims and have extended the 'arguable probable cause' doctrine to such arrests").

It does not stand to reason that this Court can find that it was "clearly established" at the time of the plaintiff's 2010 arrest that she had "a First Amendment right to be free from a retaliatory arrest that is supported by probable cause," <u>see</u> <u>Reichle</u>, ___ U.S. at ___, 132 S.Ct at 2093, when this Circuit "expressly declined to decide" this issue, <u>Moore</u>, 704 F.3d at 1004.  Thus, because the constitutional right "to be free from a retaliatory arrest that is supported by probable cause," was not clearly established at the time of the plaintiff's arrest, the Court must grant the defendant's motion for summary judgment on the grounds that he is entitled to qualified immunity as to this claim.[13]  <u>See</u> <u>Will v. Hallock</u>, 546 U.S. 345, 353 (2006) (holding that a grant of qualified immunity is appropriate in circumstances in which "the burden of trial is unjustified in the face of a colorable claim that the law on point was not clear when the official took action, . . .").

---

[13] Moreover, in light of the fact that the Court has found probable cause to arrest the plaintiff for unlawful entry, the plaintiff's argument that "the First and Fourth Amendments are implicated simultaneously when a speaker is arrested in retaliation for speech alone [because] [s]uch an arrest would clearly violate the First Amendment," as inapplicable.  Pl.'s Reply at 5 (emphasis omitted).  Given that the plaintiff was arrested for both unlawful entry and disorderly conduct, this argument is meritless at the onset, because it is apparent that the plaintiff was not arrested for "speech alone," but rather for unlawful entry based on probable cause.  <u>See</u> <u>Galarnyk</u>, 687 F.3d at 1076 (upholding a district court's determination that probable cause existed for trespass defeated a retaliatory arrest claim).  Moreover, the plaintiff's discussion of the District of Columbia's <u>revised</u> Disorderly Conduct Statue, implemented <u>after</u> the plaintiff's arrest, is fruitless.

### 4. The Plaintiff's Fourth Amendment Malicious Prosecution Claim

Count Four of the plaintiff's complaint alleges malicious prosecution by the defendant. Compl. ¶¶ 72–79. "Malicious prosecution is actionable under 42 U.S.C. § 1983 to the extent that the defendant's actions cause the plaintiff to be unreasonably 'seized' without probable cause, in violation of the Fourth Amendment." Pitt v. District of Columbia, 491 F.3d 494, 511 (D.C. Cir. 2007). The defendant argues that the plaintiff has failed to state a claim upon which relief can be granted as to the her malicious prosecution claims because "probable cause [existed] for the arrest and the [plaintiff's] inability . . . to prove that the criminal charges were terminated in her favor are fatal to her claims under this count." Def.'s Mem. at 7. Because the Court has already determined that the defendant had probable cause to arrest the plaintiff, her malicious prosecution claim is not actionable under 42 U.S.C. § 1983.[14] Thus, this claim must be dismissed.

---

[14] Even if the defendant did not have probable cause to arrest the plaintiff, her malicious prosecution claim still fails because she is unable to establish that "the underlying suit terminated in [her] favor." Brown v. Carr, 503 A.2d 1241, 1244 (D.C. 1986) (outlining requirements of a malicious prosecution). "If [the termination] [of the underlying case] is of such a nature as to indicate the innocence of the accused, it is a favorable termination sufficient to satisfy the requirement. If, however, the dismissal is on technical grounds, for procedural reasons, . . . it does not constitute favorable termination." Brown, 503 A.2d at 1245 (first alteration in original) (citation omitted). The "[p]laintiff bears the burden of alleging that h[er] charges were dismissed with prejudice." Harris v. District of Columbia, 696 F. Supp. 2d 123, 134 (D.D.C. 2010) (citing United States v. Jackson, 528 A.2d 1211, 1223 n.29 (D.C. 1987) (stating that the plaintiff failed to show that certain charges against him were dismissed with prejudice where "[t]he docket entry . . . simply reads that [the count in question] was dismissed by the government")). And under District of Columbia law, "[a] dismissal shall be without prejudice unless otherwise stated." D.C. R. Crim. P. 48(a) (emphasis added); see also Harris, 696 F. Supp. 2d at 134; O'Quinn v. District of Columbia, CIV. A. Nos. 87–0074 (RLC), 87–0095 (RLC), 1988 WL 23244, at *2 (D.D.C. 1988) ("Prosecutors may dismiss or nolle prosequi cases for a whole host of reasons. . . . But where prosecutors have not stated their reasons, there is really no way for this Court to conclude that these were favorable terminations.").

The docket report for the plaintiff's underlying charges indicates only that the charges were dismissed nolle prosequi. Def.'s Mem., Ex. 12 at 1. Because the underlying charges were dismissed without any indication that the dismissal was with prejudice, and because the plaintiff's counsel has not provided the Court with "supporting documents from the trial Court to further explain the [favorable nature of the] dismissal" as he represented he would attempt to do, Pl.'s Opp'n at 7, the plaintiff fails to state a claim for malicious prosecution. See Harris, 696 F. Supp. 2d at 134. Thus, this claim must be dismissed regardless of the existence of probable cause.

## B.  The Plaintiff's Common Law Claims

### 1.  The Plaintiff's Intentional Infliction of Emotional Distress Claim

The defendant seeks dismissal of the plaintiff's claim for intentional infliction of emotional distress, arguing that this claim is time-barred by the applicable statute of limitations. Def.'s Mem. at 6–7.  Specifically, the defendant argues that a "one year statute of limitations" applies because the plaintiff's intentional infliction of emotional distress claim is "intertwined with, and an outgrowth of, the facts in support of the alleged false arrest, excessive force (battery)[,] and malicious prosecution of [the plaintiff]."  Id. at 6 (citing D.C. Code § 12–301(4)). The plaintiff opposes the defendant's motion, contending that the applicable statute of limitations is three years because "the [intentional infliction of emotional distress] claim is intertwined with the § 1983 claims . . . ."  Pl.'s Opp'n at 6 (citing Hamilton v. District of Columbia, 852 F. Supp. 2d 139, 152–53 (D.D.C. 2012)).  In response, the defendant asserts that "§ 1983 does not provide an independent limitation period for common law torts . . . ."  Def.'s Reply at 4 (citing cases).

"[W]here state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions."  Owens v. Okure, 488 U.S. 235, 249–50 (1989); see also id. at 250 n.12 ("Courts should resort to residual statutes of limitations only where state law provides multiple statutes of limitations for personal injury actions and the residual one embraces . . . unspecified personal injury actions"); Sykes v. U.S. Attorney for the Dist. of Columbia, 770 F. Supp. 2d 152, 155 (D.D.C. 2011).  Although District of Columbia law provides a one-year statute of limitations for certain personal injury actions—intentional infliction of emotional distress is not among those enumerated causes of action.  D.C. Code § 12–301(4) (2010).  Consequently, the District of Columbia's residual three-year statute of limitations is applicable to the plaintiff's intentional

infloss of emotional distress claims based on her § 1983 excessive force claim.  See Owens,

488 U.S. at 249–50.  Thus, because one of the plaintiff's §1983 excessive force claim survives

the defendant's summary judgment motion, the applicable statute of limitations here is three

years.  D.C. Code § 12–301(8) (codifying a three-year statute of limitations for claims "not

otherwise specifically prescribed").  Indeed, this issue is not one of first impression to the Court,

and the defendant presents no persuasive argument that convinces the Court that is should take a

different position.[15]  See Hamilton, 852 F. Supp. 2d at 152 ("[P]laintiffs' [intentional infliction of

emotional distress] claim is bound by the three-year residual statute of limitations" when claim is

intertwined with the § 1983 claim).

Here, the parties do not dispute that the events leading to this suit occurred on September

16, 2010.  See Compl. ¶ 6; Def.'s Facts ¶¶ 1–3; Pl.'s Facts  ¶¶ 1–3.  There is also consensus that

the plaintiff filed her complaint on May 7, 2012.  Compl. at 14; Def.'s Facts ¶ 19; Pl.'s Resp.

Facts ¶ 19.  Thus, because the plaintiff filed her complaint within three years of September 16,

2010, and she still has one viable § 1983 claim, the plaintiff's intentional infliction of emotional

distress claim is not time-barred by the statute of limitations.  The Court, therefore, denies the

---

[15] The defendant, in arguing for the applicability of the one-year statute of limitations, cites numerous cases readily distinguishable from this case.  See Def.'s Mem. at 7;  Def.'s Reply at 4–5.  The cases cited by the defendant concern intentional infliction of emotional distress claims intertwined with other common-law claims, rather than with § 1983 claims.  See Rendall-Speranza v. Nassim, 107 F.3d 913, 920 (D.C. Cir. 1997) (determining that "the one-year period of limitation for [common-law] assault and battery applies to . . . claim[s] for intentional infliction of emotional distress"); Singh v. District of Columbia, 881 F. Supp. 2d 76, 81–83 (D.D.C. 2012) (determining that intentional infliction of emotional distress claim was intertwined with his common-law malicious prosecution claim, resulting in a one-year statute of limitations); Zhi Chen v. Monk, 701 F. Supp. 2d 32, 35–37 (D.D.C. 2010) (dismissing the plaintiff's intentional infliction of emotional distress claim as time-barred by the one-year statute of limitations because it was intertwined with other common-law torts); Rynn v. Jaffe, 457 F. Supp. 2d 22, 23–24 (D.D.C. 2006) (determining the plaintiffs' intentional infliction of emotional distress claim was intertwined with other common-law torts and, therefore, barred by the one-year statute of limitations); see also Moreno v. District of Columbia, 925 F. Supp. 2d 93, 99 n.1 (D.D.C. 2013) (refusing to address the argument "that most of [the plaintiff]'s common law claims [we]re barred by the District of Columbia's one-year statute of limitations").

defendant's motion for summary judgment on the plaintiff's intentional infliction of emotional distress claim.

### 1. The Plaintiff's Invasion of Privacy Claim

The defendant asserts that the plaintiff fails to state a claim upon which relief can be granted for invasion of privacy. Def.'s Mem. at 8. The plaintiff contests this position, arguing that "the defendant repeatedly pulled up [her] skirt exposing her red thong panties and naked buttocks for the general public and himself to view and videotape." Pl.'s Opp'n at 7. While invasion of privacy encompasses four distinct torts, see Wolf v. Regardie, 553 A.2d 1213, 1216–17 (D.C. 1989), since the plaintiff only claims an invasion of privacy by "intrusion upon seclusion," Compl. ¶ 91, the Court will only consider this single theory of liability.

Invasion of privacy by intrusion upon seclusion requires three distinct elements:

(1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself [or herself], or into his [or her] private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person.

Danai v. Canal Square Assocs., 862 A.2d 395, 400 (D.C. 2004) (alteration in original) (citations omitted).

The plaintiff alleges that the defendant "physically intruded upon [her] privacy by pulling up her skirt and exposing her red thong panties and naked buttocks for himself and the general public to view," Compl. ¶ 92; see also Pl.'s Facts ¶ 14, and that he "further intruded upon [her] privacy by pressing what [she] believes to be his erect penis against [her] leg and bare buttocks," Compl. ¶ 93; see also Pl.'s Facts ¶ 14. The defendant disputes these facts. Def.'s Mem. at 9; Def.'s Facts ¶ 14. The interpretation of the YouTube recording is material to the resolution of this claim and as the Court has already ruled, both parties conflicting perspective could be

embraced by a jury. Moreover, the Court has no way to determine whether the defendant "press[ed] . . . his erect penis against [the plaintiff's] leg and bare buttocks," Pl.'s Opp'n at 7; Pl.'s Facts ¶ 38, without weighing the credibility of the parties' conflicting testimony. This, the Court is not permitted to do, as "the weighing of evidence and the drawing of legitimate inference from the facts are jury functions, not those of a jury . . . ruling on a motion for summary judgment."[16] Anderson, 477 U.S. at 225.

## IV. CONCLUSION

For the foregoing reasons, the Court denies the plaintiff's motion for summary judgment. Further, the Court grants the defendant's motions for summary judgment as to the plaintiff's first, second, and fourth causes of action and denies it as to the plaintiff's third, fifth, and sixth claims.[17]

**SO ORDERED** this 16th day of October, 2014.

REGGIE B. WALTON
United States District Judge

---

[16] Although the defendant rightfully notes that he cannot be liable for a third party posting a recording of the events online, see Def.'s Mem. at 8–9, that does not preclude the defendant from being held liable on the plaintiff's invasion of privacy claim, see Randolph v. ING Life Ins. & Annuity Co., 973 A.2d 702, 711 (D.C. 2009) (citing Restatement (Second) of Torts § 652B cmt. b (1977) ("The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined.")).

[17] An order consistent with this memorandum opinion will be issued contemporaneously.